**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NADIRAH MCRAE, Individually and as Class Representative and RICHARD JEAN as the Parent and Guardian of D.J., Individually and as Class Representative <br><br> v. <br><br> SCHOOL DISTRICT OF PHILADELPHIA | No. 2:17-cv-04054-PBT |

**MOTION TO SUBSTITUTE CLASS REPRESENTATIVE**
**AND FOR CLASS CERTIFICATION**

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Plaintiffs, by and through their undersigned counsel, move this Court for the entry of an Order substituting class representative, certifying them as a class, certifying this action as a class action, appointing Plaintiffs as class representatives, and appointing counsel as class counsel.  The legal authority and arguments in support of the Plaintiffs' Motion to Substitute Class Representative and for Class Certification are set forth in the accompanying Memorandum of Law filed contemporaneously with this Motion.

As set forth in greater detail in the Plaintiffs' Memorandum of Law, when a named plaintiff's standing is lost unnamed plaintiffs and class members may substitute, intervene, or file a new action.  Since named Plaintiff Richard Jean's daughter graduation has affected her standing, he now seeks to substitute his younger daughter, who is a currant student and athlete in the School District of Philadelphia, as a class representative.

Further, class certification is warranted because the members of the class number is in the thousands; the action involves common facts, issues and potential resolution is common to all class members; the injury and legal theories supporting the named class representatives' claims

are typical of those of the proposed class; and the named Plaintiffs and their counsel have and will continue to provide adequate representation for the class.

Accordingly, Class Plaintiffs request that this Court certify this case as a class action and set a status conference to set forth a merits discovery schedule.

Respectfully submitted,

**FREIWALD LAW, P.C.**

By: _____

GLENN A. ELLIS, ESQUIRE
Attorney for Plaintiffs

Date:  February 12, 2020

2

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………….…..iii

I.      INTRODUCTION…………………………………………………………3

II.     CLASS PLAINTIFFS …………………………………………………......4

III.    PROCEDURAL BACKGROUND ………………………………………...5

IV.     LEGISLATIVE BACKGROUND ………………………….…..…………7

V.      FACTUAL BACKGROUND…………………………………… …9

VI.     ARGUMENT…………………………………………………………17

        A.      Motion to Substitute Class Representative…………………………...........17

        B.      Motion for Class Certification……………………………………19

                i.      Class Definition and Class Nature of The Claims…….………………19

                ii.     Class Certification Under Federal Rule Civil Procedure No. 23………...21

                        1.      The Proposed Class is So Numerous that Joinder of All Class Members is Impracticable…………………………………...22

                                a.      Class Size………………………………………..………….23

                                b.      Prospective and Future Female Students……………….24

                                c.      Expense and Burden…...…………………………….26

                                d.      Nature of The Claims………………………………....27

                        2.      Common Questions of Law and Fact Apply to The Class..……...27

                        3.      The Class Representatives' Claims are Typical of Those of The Class.…………………………………………………30

                        4.      The Named Plaintiffs and Their Counsel are Adequate Class Representatives………………………………………32

                                a.      Class Counsel………………………………………32

i

        b.      Class Representatives………...……………………...…32

B.     The Proposed Class Satisfies Federal Rule of Civil Procedure No. 23(b)(1)...…..33

C.     The Proposed Class Satisfies Federal Rule of Civil Procedure No. 23(b)(2)…....34

VII.   CONCLUSION…………………………………………………..………..…36

## ATTACHED EXHIBITS

EXHIBIT A – DEPOSITION OF JAMES P. LYNCH

EXHIBIT B – TABLE 1: 2012-2013 ENROLLMENT AND PARTICIPATION DATA

EXHIBIT C – TABLE 2: 2019-2020 ENROLLMENT AND PARTICIPATION DATA

EXHIBIT D – TABLE 3: 2012-2013 EXPENDITURE DATA

## **<u>TABLE OF AUTHORITIES</u>**

**CASES**

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591, 625-26, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)............................32

*American Pipe & Construction Co. v. Utah,*
414 U.S. 538, 553 (1974)....................................................................17

*Arthur v. Starrett City Assoc.,*
98 F.R.D. 500, 505-506 (EDNY 1983).....................................................25

*Atkins v. Toan,*
595 F.Supp. 104, 105 (W.D.Mo. 1984)....................................................25

*Baby Neal v. Casey,*
43 F.3d 48, 58-59 (3d Cir. 1994)......................................................31, 35

*Barnes v. The American Tobacco Company,*
161 F.3d 127 (3d Cir. 1998)...............................................................35

*Califano v. Yamasaki,*
442 U.S. 682, 700–701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979).........................22

*Caridad v. Metro-North Commuter R.R.,*
191 F.3d 283, 293 (2d Cir. 1999)..........................................................31

*Cannon v. University of Chicago,*
441 U.S. 677, 706 (1979)...................................................................35

*Cohen v. Brown Univ.,*
991 F.2d 888, 893 (1st Cir. 1993).........................................................20

*Comcast Corp. v. Behrend,*
569 U.S. 27, 33, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013)..............................22

*Cook v. Colgate University,*
992 F.2d 17, 19 (2nd Cir. 1993)...........................................................27

*Doe v. Los Angeles Unified Sch. Dist.,*
48 F. Supp. 2d 1233, 1242 (C.D. Cal. 1999)............................................28

*Eubank v. Pella Corp.,*
  753 F.3d 718, 719 (7th Cir. 2014)..................................................................21

*Favia v. Indiana University of Pennsylvania,*
  7 F.3d 332, 335-36 (3rd Cir. 1993)..............................................................20

*Folsom v. Blum,*
  87 F.R.D. 443, 445 (SDNY 1980)..................................................................25

*Gay v. Waiters' and Dairy Lunchmen's Union,*
  549 F.2d 1330, 1333 (9th Cir. 1977)............................................................35

*Gomez v. Illinois State Bd. of Ed.,*
  117 F.R.D. 394, 399 (N.D.Ill. 1987)............................................................25

*Hassine v. Jeffes,*
  846 F.2d 169, 177 (3d Cir. 1988)............................................................30, 31

*Hydrogen Peroxide,*
  552 F.3d at 309 n.6..........................................................................................22

*Jane B. v. New York City Dept. of Social Services,*
  117 F.R.D. 64, 70 (SDNY 1987)....................................................................25

*Kennedy v. Tallant,*
  710 F.2d 711, 718 (11th Cir. 1983)..............................................................21

*Keyes v. Sch. Dist. No. 1, Denver, Colo.,*
  576 F. Supp. 1503 (D. Colo. 1983)................................................................28

*Kline v. Security Guards, Inc.,*
  196 F.R.D. 261, 270 (E.D. Pa. 2000)............................................................27

*Marcus v. BMW of N. Am., LLC,*
  687 F.3d 583, 596–97 (3d Cir. 2012)........................................................23, 27

*Mielo v. Steak 'n Shake Operations, Inc.,*
  897 F.3d 467, 483–84 (3d Cir. 2018)........................................................22, 23

*Modafinil Antitrust Litig.,*
  837 F.3d 238, 252-253 (3d Cir. 2016)..........................................................22

*Mullaney v. Anderson,*
  342 U.S. 415, 417 (1952)................................................................................18

iv

*National Ass'n of Radiation Survivors v. Walters*,
    111 F.R.D. 595, 599 (N.D.Cal. 1986)……………………………………………24

*O'Dell v. Nat'l Recovery Agency*,
    291 F. Supp. 3d 687, 698 (E.D. Pa. 2018)………………………………27, 28, 30, 31

*Parker v. Time Warner Entertainment Co., L.P.*,
    198 F.R.D. 374, 378 (E.D.N.Y. 2001)……………………………………………35

*Phillips v Ford Motor Co.*,
    435 F. 3d 785, 787 (7th Cir. 2005)………………………………………………18

*Polo Builders, Inc.*,
    374 B.R. 638, 644 (N.D. Ill. Bankr. 2007)………………………………………18

*Prudential Ins. Co. of Am. Sales Practices Litig.*,
    962 F.Supp. 450, 468, 510 (D.N.J.1997)………………………………………23

*P.V. v. Sch. Dist. of Philadelphia*,
    289 F.R.D. 227 (E.D. Pa. 2013)…………………………………………………19

*Robidoux v. Celani*,
    987 F.2d 931, 936-37 (2d Cir. 1993)……………………………………………30

*Robinson v. Metro-North Commuter R. R. Co.*,
    267 F.3d 147, 155 (2d Cir. 2001)……………………………………………30, 34

*Rosetti v. Shalala*,
    12 F.3d 1216, 1232 n.33 (3d Cir. 1993)…………………………………………17

*Santiago v. City of Philadelphia*,
    72 F.R.D. 619, 624 (E.D.Pa. 1976)………………………………………………25

*Sogevalor, S.A. v. Penn Central Corp.*,
    137 F.R.D. 12, 14 (S.D. Ohio 1991)……………………………………………18

*Southwest v. Falcon*,
    457 U.S. 147, 155, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)……………………22

*Stewart v. Abraham*,
    275 F.3d 220, 226–27 (3d Cir. 2001)………………………………………23, 25, 31

*United States v. Sielaff*,
    546 F.2d 218, 222 (7th Cir. 1976)………………………………………………26

v

*United States Fidelity & Guaranty Co. v. Lord*,
    585 F.2d 860, 870 (8th Cir. 1978)……………………………………………...26

*Von Collin v. County of Ventura*,
    189 F.R.D. 583, 590 (C.D.Cal. 1999)…………………………………………...25

*Wal–Mart Stores, Inc. v. Dukes*,
    564 U.S. 338, 350 (2011)……………………………………………………24, 27

*Wellbutrin XL Antitrust Litg.*,
    282 F.R.D. 126, 139 (E.D. Pa. 2011)…………………………………………...18

*Wright v. Am. Bankers Life Assur. Co.*,
    586 F Supp. 2d 464, 475 (D.S.C. 2008)………………………………………...17

Herbert Newberg & Alba Conte, Newberg on Class Actions § 2.26…………………………...18

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NADIRAH MCRAE, Individually and as Class Representative and RICHARD JEAN as the Parent and Guardian of D.J., Individually and as Class Representative<br><br>v.<br><br>SCHOOL DISTRICT OF PHILADELPHIA | No. 2:17-cv-04054-PBT |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUBSTITUTE CLASS
REPRESENTATIVE AND FOR CLASS CERTIFICATION**

## I.     INTRODUCTION

The Third Circuit and district courts therein widely recognize that class certification is the ideal device for a civil rights challenge to a systemically deficient education policy and practice.  This is especially so when, in the first instance, that policy and practice impedes a student's receipt of appropriate and meaningful educational benefits.  Such as the case here. Plaintiffs filed this class action to stop the systemic, ongoing sex and race discrimination in the School District of Philadelphia's (herein the "District") athletic department.

Plaintiffs filed suit against the District on behalf of a class of similarly situated persons (collectively, the "Plaintiffs") to enforce their civil rights under Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972.  The Plaintiffs allege that the District violates Titles VI and IX by, among other things: (1) failing to provide female students with an equal opportunity to participate in high school athletics; (2) failing to provide female students with the same or comparable financial resources and/or benefits provided to male athletes; and (3) failing to provide equal athletic opportunities and resources to African-American female students.

3

Accordingly, the Plaintiffs seek relief not just for themselves but for all persons who are harmed by and will continue to be harmed by the District's illegal and discriminatory actions. As set forth in the Second Amended Complaint, the Plaintiffs are seeking to certify a class consisting of the following:

> all past, present and future African-American female student athletes, who participate, seek to participate, or have been deterred or prevented from participating in athletic programs, including but not limited to Field Hockey and Lacrosse, because of the Philadelphia School District's discriminatory actions in the (1) allocation of athletic participation opportunities; (2) allocation of financial resources; and (3) allocation of benefits.

ECF No. 30 at ¶22.

Plaintiffs' class satisfies the requirements of Rule 23 because the members of the class number is in the thousands; the action involves common facts, issues and potential resolution are common to all class members; the injury and legal theories supporting the named class representatives' claims are typical of those of the proposed class; and the named Plaintiffs and their counsel have and will continue to provide adequate representation for the class.

## II.    CLASS PLAINTIFFS

Plaintiff Nadirah McRae is a black female former student athlete at Strawberry Mansion High School, a public school in Philadelphia, PA.ECF No. 30 at ¶ 30. Plaintiff McRae specifically alleges that Defendant's discriminatory actions resulted in her having lost the opportunity to play lacrosse for the University of Hartford and her having lost an athletic scholarship offer from the University of Hartford in the amount of $250,000.00. *Id.* at ¶ 67. Plaintiff McRae seeks to recover the damages on her behalf and on behalf of the class.

Plaintiff Richard Jean is the father of both a former and a current female student athlete in the District. In light of the Court's holding and reasoning on standing and mootness (ECF No. 17 at pg. 6-11) and the fact that senior D.J. has graduated from Strawberry Mansion High

4

School, Plaintiff Jean seeks to substitute his younger daughter D.J. as Class Representative.[1] Plaintiff Jean's younger daughter D.J. is a current student and athlete at Strawberry Mansion High School.  Plaintiff Jean as the parent and guardian of D.J. seeks damages and injunctive relief on behalf of the class to stop and force the District to comply with Title VI and IX.

As determined by the Court, Plaintiff McRae has standing to seek damages and current students like Plaintiff Jean's younger daughter D.J. have standing to seek damages and injunctive relief. *See* ECF 17.

## III.    PROCEDURAL BACKGROUND

On September 12, 2017, Plaintiff Nadirah McRae, a black female former student athlete at Strawberry Mansion High School, a public school in Philadelphia, PA, filed suit against the District for its alleged violations of Title VI (race discrimination) and Title IX (sex discrimination).  ECF No. 17 at pg. 2.  Plaintiff McRae brought suit as an individual and as a potential class representative in a putative class action. *Id.*

In response, the District filed a Motion to Dismiss contending that, among other things, Plaintiff McRae lacked standing to bring suit against Defendants because she had already graduated from Strawberry Mansion High School by the time Plaintiff McRae filed the Complaint. *Id.*  In response, Plaintiff McRae filed an Amended Complaint, which added, among other things, a new Plaintiff, senior D.J., a black female and current student athlete at Strawberry Mansion High School. *Id. citing* Amended Compl. ¶¶ 9, 54, ECF No. 10.

---

[1] Plaintiffs' Counsel informed Defense Counsel that Plaintiff Jean sought to substitute his younger daughter D.J. as class representative on December 30, 2018.  Plaintiffs' Counsel also informed Defense Counsel that the younger D.J. was available to be deposed on January 7, 2019, which was the agreed upon date for Plaintiff McRae's deposition.  Defense Counsel opted not to take her deposition and stated that the District would object to the substitution.

As noted by the Court, in short, the Amended Complaint provides that the District violated Title VI and Title IX:

> by failing to provide black female student athletes with equal opportunities to play field hockey and lacrosse and by failing to provide black female student athletes with the same resources and benefits as are provided to non-black and male student athletes. Amended Compl. ¶ 7.... Plaintiffs also contend that Defendants' violations of Title VI and Title IX included Defendants' failure to provide equal access to transportation to athletic competitions, equal access to funds that are used to pay for athletic uniforms, equal exposure to college athletic recruiters, and equal access to athletic and academic support staff. Amended Compl. ¶ 62.

*Id.* at pg. 2-3.  In response to the Amended Complaint, the District renewed its Motion to Dismiss.  *Id.* The District argued that dismissal was appropriate because (A) neither Plaintiff has standing to pursue her claims; (B) Plaintiffs' claims are also moot because Plaintiffs have graduated or will soon graduate from Strawberry Mansion High School; and (C) Plaintiffs have failed to allege facts sufficient to state the prima facie case for either Title VI race discrimination or Title IX sex discrimination. *Id.*

On September 6, 2018, upon consideration of Plaintiffs' Response in Opposition to the District's Motion to Dismiss, the Court held that Plaintiffs McRae and D.J. had alleged sufficient facts to set forth claims for Title IX and Title VI discrimination.  *Id.* at pg. 12-15.  The Court also held that while Plaintiff McRae had standing to pursue her damages stemming from the District's discrimination, she lacked standing to seek injunctive relief.  *Id.* at pg. 6.  However, Plaintiff senior D.J., because she was a current student at the time, had standing to seek damages and injunctive relief.  *Id.* at pg. 6-11.

On October 17, 2018, the District filed its Answer to the Plaintiffs' Amended Complaint. ECF No. 21.  After the Court's Rule 16 Conference, on January 30, 2019, ordered that the Plaintiffs had until March 4, 2019 to file a Second Amended Complaint.  ECF No. 29. Accordingly, on March 4, 2019, Plaintiffs filed a Second Amended Complaint which corrected

6

the identity of the District and clarified that Plaintiffs were seeking class certification under Rule

23(b)(1) and (2).  ECF No. 30.  On April 3, 2019, the District filed its Answer to the Plaintiffs'

Second Amended Complaint.  ECF No. 32.

On May 6, 2019, the Court ordered that discovery would be bifurcated between class and

merits issues and set forth a schedule for class discovery.  ECF No. 34.  On November 18, 2019,

the Court extended the class fact discovery time period and set forth a date for Plaintiffs' Motion

for Class Certification and the District's opposition.  ECF No. 37.

Plaintiffs' file the instant Motion for Class Certification in accordance with the Court's

scheduling Order.

## IV.  LEGISLATIVE BACKGROUND

Title VI provides that "[n]o person in the United States shall, on the ground of race,

color, or national origin, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any program or activity receiving Federal financial assistance."

42 U.S.C. § 2000(d).  Title IX, enacted in 1972, is the federal law that prohibits sex

discrimination in any school receiving federal funding and provides in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from
> participation in, be denied the benefits of, or be subjected to discrimination under
> any education program or activity receiving Federal financial assistance. . .

20 U.S.C. §1681(a).

The Regulations that accompany Title IX, which were promulgated first by the

Department of Health, Education and Welfare and then by the Department of Education, require

that federal fund recipients, like the District, undertake remedial and affirmative efforts to

eliminate sex discrimination from their programs.  *See* 34 C.F.R. § 106.

The regulations further direct school administrators to evaluate their own policies and actions and to modify any policies and actions that are discriminatory; and to take remedial steps to eliminate the effects of discriminatory actions. *See* 34 C.F.R. § 106.3(c) and § 106.4(a). It should be noted that these mandates apply whether or not anyone has complained about discrimination.

Furthermore, "every application for Federal financial assistance shall as condition of its approval contain or be accompanied by an assurance from the applicant or recipient, . . . that the education program or activity . . . will be operated in compliance with [34 C.F.R. § 106]." 34 C.F.R. § 106.4(a). Every application for Federal financial assistance also requires that each applicant or recipient "commit itself to take whatever remedial action is necessary in accordance with §106.3(a) to eliminate existing discrimination on the basis of sex or to eliminate the effects of past discrimination. . ." *Id.*

To ensure that applicants and recipients of Federal financial assistance comply with the above obligations, the Department of Education requires each school to have a designated Title IX coordinator to investigate any complaints made and to develop and publicize Title IX complaint procedures. *See* 34 C.F.R. § 106.8(a) & (b).

Finally, regarding school athletic programs, the Department of Education has adopted 34 C.F.R. §106.41, which provides in relevant part:

> (a) General. No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.
>
> (c) Equal opportunity. A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. . .

34 C.F.R. §106.41 (a) and (c).  It should be noted that the equitable treatment requirements of Title IX extend to equipment and supplies, game and practice schedules, travel and per diem expense allowances, coaching, locker rooms and practice facilities, trainer services, housing and dining services, and publicity.  *See* 44 Fed. Reg. 71415.

Since the District receives federal financial assistance, its athletic program is subject to Title VI and Title IX and the District must comply with its requirements.

## V.   FACTUAL BACKGROUND

The remedial and affirmative requirements, of Title IX and 34 C.F.R. § 106, have had a dramatic effect on female participation levels in high school and collegiate sports nationwide.  At the time Title IX became law, only 294,000 females participated in interscholastic high school sports nationwide, which represented just 7 percent of all high school athletes.  *See* Nat'l Fed'n of State High Sch. Ass'n, 2014-15 High School Athletics Participation Survey 55 (2015).[2]  Since the passing of Title IX and the adoption of its accompanying regulations, the number of females playing high school sports has increased dramatically.  In fact, by the 2014-15 school year, over 3.2 million females were playing high school sports, which represented 42 percent of all athletes in U.S. high schools.  *Id.*

Despite these dramatic gains, a significate nationwide gender gap continues exist between males and females' sports at the high school level.  For example, the participation numbers among high school students in the Commonwealth of Pennsylvania, for the 2007-2008 school year, show that 53.5% of sports opportunities were offered to boys (153,443 opportunities) while 46.5% were provided to females (133,549 opportunities).  *See* NFSHSA Participation Survey, *supra* note 2, at 49.  Thus, if you compare the number of athletic opportunities for females and

---

[2] http://www.nfhs.org/ParticipationStatistics/PDF/2014-15_Participation_Survey_Results.pdf

males, there were 19,894 fewer opportunities for females to play sports in Pennsylvania high schools than there were for boys.

Finally, the gender gap is greatest in urban schools, such as the District, where in 2007 only 45% of the females were involved in athletics as compared to 73% of the boys' grades 3-12. *See* D. Sabo & P. Veliz, Go Out and Play: Youth Sports in America 26 (Women's Sports Foundation 2008).  The nationwide survey also found that the lowest rates of participation in organized sports programs was among African-American, Hispanic, and Asian females.  *Id.* at pg. 15-16.  The exacerbation of the disparity between male and female athletic participation in urban school districts is a product of traditional race discrimination being compounded by negative female stereotypes and outright sex discrimination.

In an effort to provide greater transparency and accountability the Pennsylvania Legislature, in 2012, passed a law requiring all secondary schools to publicly report student athletic participation by gender, race, and ethnicity, and information about athletic facilities, equipment, coaching, and athletic expenditures by gender to the PA Department of Education, which is required to post the reports on its website.  *See* Act 82 of 2012 added Article XVI-C to the Public School Code of 1949.

Despite the disclosure requirements of Act 82, the District has only submitted information for one school year (2012-2013).  According to Executive Director of Athletics James Lynch, the District has decided that it will not comply with the above requirements because it would be too difficult.  *See* Deposition of Mr. Lynch at pg. 69-71 ln. 9-17, attached as Ex A.  This is obviously not true since the District was able to provide the required disclosures for 2012-2013.  Furthermore, a review of the PA Department of Education database shows that

the charter school that participate in the Philadelphia Public League have had no problem providing the required disclosures.[3]

Perhaps more shocking then the fact that the District is blatantly ignoring the requirements of Act 82, is Mr. Lynch's testimony regarding the District's Title IX compliance. Mr. Lynch testified as follows:

Q.      That's one of the essential functions of your office, correct, in showing that the program is being run correctly throughout the district, the athletic program, correct?

MS. HOFFMAN: Objection.

THE WITNESS: Yes.

Q.      And central to that is making sure that you are adhering to providing equal opportunities to boys and girls throughout the district, correct?

MS. HOFFMAN: Objection.

THE WITNESS: Yes.

Q.      Based on your review and based on your experience and your position, is it your understanding that the number of male and female athletic participation opportunities are substantially proportionate throughout the school district?

MS. HOFFMAN: Objection.

THE WITNESS: Can you repeat that?

BY MR. ELLIS:

Q.      Throughout the school district, are the number of female and male participants in athletics substantially proportionate? I don't mean identical, but pretty close.

MS. HOFFMAN: Objection.

THE WITNESS: I guess you have information you want to show me.

BY MR. ELLIS:

---

[3] https://www.education.pa.gov/Teachers%20-%20Administrators/Interscholastic%20Athletic%20Opportunity/Pages/default.aspx

Q.      I just want to know what your understanding is as the athletic director. Are the numbers of female and male athletic participants substantially proportionate to each other? If you don't know, that's fine.

A.      I can't answer that.

*See* Ex. A at pg. 111-113 ln. 23-19.

Q.      Let's go to the first prong, substantial proportionality.  Do you know whether or not there is substantial proportionality across the district between male and female participants?

MS. HOFFMAN: Objection. Calls for a legal conclusion.

THE WITNESS: I can't accurately answer that.

*Id.* at pg. 120 ln. 5-12.  In other words, the District has taken the position that it would rather not know whether or not it is in compliance with Title IX.  That is a clear violation of Title IX affirmative obligation to remediate sex discrimination and it is clearly a violation of any certifications filed by the District with the Department of Education.

As discussed below, if Mr. Lynch had bothered to look at the old data or had bothered to look at the data from the most recent year he would have found that the District is not in compliance with Title IX and may in fact be violating Title VI as well. A review of the 2012-2013 data shows that the twenty-one Neighborhood and Citywide admission High Schools[4] had a

---

[4] The School District of Philadelphia's High schools are comprised of Neighborhood, Citywide and Special Admissions Schools. Since Special Admissions High Schools have their own set of admissions criteria for prospective students, while both Neighborhood and Citywide High schools do not have a unique set of criteria necessary for entry, they were excluded from our analysis and calculations only reflect data from the twenty-one Neighborhood and Citywide Admission High Schools. [https://www.philasd.org/cte/wp-content/uploads/sites/155/2019/09/HS-Directory-2020-WEB-2019-09-09.pdf (Page 4)]

The twenty-one Neighborhood and Citywide Admission High Schools involved in our data collection are the following: Strawberry Mansion High School, Samuel Fels High School, High School of the Future, Roxborough High School, Abraham Lincoln High School, Overbrook High School, Thomas A. Edison High School, West Philadelphia High School, Constitution High School, Martin Luther King High School, Swenson Arts and Technology High School, Frankford High School, Furness High School, South Philadelphia High School, Jules E. Mastbaum High School, Benjamin Franklin School, George Washington High School, Northeast High School, A. Philip Randolph Career and Technical High School, Paul Robeson High School for Human Services, and William L. Sayre High School.

combined student body of 19,597, of which 8,575 (44.48%) were female and 10,701 (55.52%) were male. *See* Table 1 attached as Exhibit B.[5]

The data shows that there were twenty-one Neighborhood and Citywide admission High Schools in the District with total of 255 teams.[6]  According to the District's data in 2012-2013, there were 88 female teams and 167 male teams.[7]  Thus, while females represented 44.48% of the total student body, only 34.50% of all sports teams were female.[8]

In other words, the gender gap between females and males across the District's twenty-one Neighborhood and Citywide admission High Schools is 9.98%.  In order to reach the mandate of Title IX the District needed to add 46 more female teams across Neighborhood and Citywide admission High Schools.

Another way to look at the gender gap is by looking at athletic opportunities, also referred to as roster spots.  According to the District's data in 2012-2013, the total number of student athletes was 4,933. *See* Ex. B.[9]  Of those student athletes 1,785 (36.18%) were female and 3,148 (63.82%) were male.  *Id.*  As noted above, the total females represented 44.48% of the total all twenty-one Neighborhood and Citywide admission High Schools in the District.

In other words, the gender gap between females and males across the District's twenty-one Neighborhood and Citywide admission High Schools is 8.30%.  While that percentage may not seem significant, in order to reach the mandate of Title IX the District would need to add 732

---

[5] The data in Table 1 was obtained from the District's website at
https://www.philasd.org/performance/programsservices/open-data/school-information/#school_enrollment
[6] This data was obtained from PA Department of Education  website at
https://www.education.pa.gov/Teachers%20-
%20Administrators/Interscholastic%20Athletic%20Opportunity/Pages/default.aspx
[7] *Id.*
[8] *Id.*
[9] The data in Table 1 was obtained from PA Department of Education  website at
https://www.education.pa.gov/Teachers%20-
%20Administrators/Interscholastic%20Athletic%20Opportunity/Pages/default.aspx

new female roster spots across its twenty-one Neighborhood and Citywide admission High Schools.

The 2012-2013 data also revealed that the District vastly underspent on the female teams as compared to the male teams.  The available data shows expenditures for Athletic Trainer Compensation, Head Coach Compensation, Travel Expenditures, Uniforms Expenditures, and Supplies/Equipment Expenditures. *See* Table 3 attached as Exhibit D.[10]

According to the data, the District spent a total of $1,776,049.84 across its twenty-one Neighborhood and Citywide admission High Schools. *Id.* Of that only $477,766.64 was spent on the 88 female teams. *Id.* The rest amounting to $1,298,283.20, which amounted to 73.1% of the District total financial support for athletics, went to the 167 male teams. *Id.*

In other words, 26.90% of total athletic expenditures was spent on female teams and 73.1% was spent on male teams, which translates into $267.65 per female athlete and $413.72 per male athlete.  Thus, the financial support gap between female and male teams across the District's twenty-one Neighborhood and Citywide admission High Schools is 7.6% or $146.07 per athlete.  However, if the District actually had attempted to comply with Title IX it would have needed to adjust its funding upward to match its addition of new female teams.  The addition of 47 new female sports teams would have required an increase in fund of approximately $315,766.64.

It should be noted that this disparity exists even if you examine the individual expenditure categories.  For example, the District spent $519,468.36 was spent on travel, uniforms and equipment across its twenty-one Neighborhood and Citywide admission High

---

[10] The data in Table 3 was obtained from PA Department of Education website at
https://www.education.pa.gov/Teachers%20-
%20Administrators/Interscholastic%20Athletic%20Opportunity/Pages/default.aspx

Schools.[11]  Of that total only $133,967.18 of it was spent on the female teams and $385,501.18 was spent on the male teams.[12]  In other words, 25.78% of funding for travel, uniforms and equipment is spent on females while 74.22% is spent on males even though female teams make up 34.50% of all teams.

As noted above, since the District has failed to comply with Act 82 there is no more recent publicly available data.  Further, Defense Counsel in this case has refused to provide any recent data regarding participation rates and financial support.  However, Plaintiffs were able to gain some understanding about the current state of the District's athletic program by examining the available public data.

According to Mr. Lynch, the ArbiterLive.com website accurately provides the number and type of female and male teams at each of the District's Neighborhood and Citywide admission High Schools[13].  *See* Ex. A at pg. 87 ln. 18-21.  Along with this information, Plaintiffs were provided a document via Discovery titled "Minimum Participation Numbers for Athletic Programs".  *Id.* Pg. 97-100 ln. 15-1.  According to Mr. Lynch if a team is listed on ArbiterLive.com it has at least the minimum number of student athletes.  *Id.*

A review of the District's 2019-2020 data shows that the twenty-six Neighborhood and Citywide admission High Schools had a combined student body of 19,583, of which 8,411

---

[11] *Id.*

[12] *Id.*

[13] For the 2019-2020 school year there were 26 Neighborhood and Citywide admission High Schools in the District, which are Strawberry Mansion High School, Samuel Fels High School, High School of the Future, Roxborough High School, Abraham Lincoln High School, Overbrook High School, Thomas A. Edison High School, West Philadelphia High School, Constitution High School, Martin Luther King High School, Swenson Arts and Technology High School, Frankford High School, Furness High School, South Philadelphia High School, Jules E. Mastbaum High School, Benjamin Franklin School, George Washington High School, Northeast High School, A. Philip Randolph Career and Technical High School, Paul Robeson High School for Human Services, William L. Sayre High School, Philadelphia Military Academy, Penn Treaty High School, John Bartram High School, Murrell Dobbins Career and Technical High School, and Kensington High School.

15

(42.95%) were female and 11,172 (57.05%) were male. *See* Table 2 attached as Exhibit C.[14] According to the District's data, obtained from ArbiterLive for 2019-2020, the total number of student athletes was approximately to 4,384. *Id.* Of those, Plaintiffs approximated that of the student athletes 1,484 (33.85%) were female and 2,900 (66.15%) were male. *Id.*

As noted above, the total females represented 42.95% of the total all twenty-six Neighborhood and Citywide admission High Schools in the District. In other words, the gender gap between females and males across the District's twenty-six Neighborhood and Citywide admission High Schools appears to have grown to 9.10%. Thus, in order to reach the mandate of Title IX the District would need to add 700 new female roster spots across its twenty-six Neighborhood and Citywide admission High Schools.

The gender gap widens when the data is examined against the available demographic data. According to the District's website, the student body across its twenty-six Neighborhood and Citywide admission High Schools is 62.13% African-American.[15] When Plaintiffs applied the above methodology to the schools that had a percentage of African-Americans greater than 62%[16], the gender gap jumped from 9.01% to 13.58%. In other words, similar to the statewide findings relating to urban districts, the schools in the District with the highest percentage of African-Americans also have the highest gender gap.

Plaintiffs ask this Court to grant this motion for class certification to force the District into compliance with Title IX and VI and close the above gender and race gap.

---

[14] The data in Table 2 was obtained from the District's website at
https://www.philasd.org/performance/programsservices/open-data/school-information/#school_enrollment
[15] *Id.*

[16] The schools with higher than 62% of African-American students were; Strawberry Mansion High School, Murrell Dobbins Career and Technical High School, High School of the Future, Roxborough High School, Overbrook High School, West Philadelphia High School, Constitution High School, Martin Luther King High School, John Bartram High School, Benjamin Franklin High School, A. Philip Randolph Career and Technical High School, Paul Robeson High School for Human Services & William L. Sayre High School.

## VI.   ARGUMENT

### A.   Plaintiff Richard Jean's Motion to Substitute minor D.J. as Class Representative.

Substitution in this case is consistent with other Supreme Court and Third Circuit cases discussing the special circumstances presented in class actions. According to binding Supreme Court and Third Circuit precedent, when a named plaintiff in a putative class action is dismissed for lack of standing or for reasons other than a substantive denial of a motion for class certification, the unnamed plaintiffs and class members may substitute, intervene, or file a new action, and the applicable statutes of limitations governing those claims will be tolled so that substitution, intervention, or a new action may be effected. *See American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 553 (1974).

As noted by the Court, "the members of the proposed class are public school students who are likely to age into and out of the class before this complex case may be fully and fairly litigated." ECF No. 17 at pg. 11.  Accordingly, "in the context of class action lawsuits, and as a matter of practice, there are a number of other procedures to avoid mootness." *Id.* at n. 8. "For example, plaintiffs frequently move to substitute a class representative whose individual claim has been mooted with a potential class representative with a live claim." *Id.  See also Wright v. Am. Bankers Life Assur. Co.,* 586 F Supp. 2d 464, 475 (D.S.C. 2008) (approving additional class representative and stating that "in the class action context, shuffling and substitution of class representatives is not uncommon").

"Such substitutions of class representatives are freely permitted." *Id. citing Rosetti v. Shalala*, 12 F.3d 1216, 1232 n.33 (3d Cir. 1993) (providing that "[o]f course, the mootness of the named plaintiffs' challenge to the Secretary's conduct will not prevent the district court from deciding whether other members of the proposed class should be permitted to intervene.").

17

Indeed, as the Seventh Circuit has noted, "Substitution of unnamed class members for named plaintiffs who fall out of the case because of settlement or other reasons is a common and normally an unexceptional ('routine') feature of class litigation...in the federal courts..." *Phillips v Ford Motor Co.*, 435 F. 3d 785, 787 (7th Cir. 2005).

Further, the practice applies well beyond the completely straightforward and administrative substitution requested here to instances where a proposed class representative's claims have been found to be moot, or where a class representative has been found to be inadequate. Herbert Newberg & Alba Conte, Newberg on Class Actions § 2.26 (collecting authority that substitution of class representatives is "freely allowed" when a named plaintiff's claim becomes moot); *see also In re Wellbutrin XL Antitrust Litg.*, 282 F.R.D. 126, 139 (E.D. Pa. 2011) (quoting Manual for Complex Litigation (Fourth) § 21.26) ("Courts generally allow class counsel time to make reasonable efforts to recruit and identify a new representative who meets the Rule 23(a) requirements. The Court may permit intervention by a new representative or may simply designate that person as a class representative in the order granting class certification.").

Several courts have even expressly noted the absurdity that could result from denying a motion to substituting the class representative. *See Sogevalor, S.A. v. Penn Central Corp.*, 137 F.R.D. 12, 14 (S.D. Ohio 1991) (noting that proposed substituted plaintiff "would simply file a new lawsuit, forcing defendants to respond at a later date to the claims presently pending in this Court"); *In re Polo Builders, Inc.*, 374 B.R. 638, 644 (N.D. Ill. Bankr. 2007) (holding under Fed. R. Civ. P. 21 if substitution were denied and the action dismissed, plaintiff "would simply file a new action . . . using the same complaint [and] [t]he parties would end up right where they are now"); *Mullaney v. Anderson*, 342 U.S. 415, 417 (1952) (permitting substitution of parties under

Fed. R. Civ. P. 21, observing that dismissal and refiling "would entail needless waste and runs counter to the effective administration of justice").

Here, since senior D.J. has graduated from Strawberry Mansion High School, Plaintiff Richard Jean seeks to substitute his younger daughter D.J. as Class Representative. Plaintiff Jean's younger daughter D.J. is a current student and athlete at Strawberry Mansion High School. It is clear from the Court's earlier opinion that senior D.J. may not have standing to seek injunctive relief in this case. Thus, Plaintiff Jean seeks to cure this potential defect by substituting his younger daughter who has standing since she is a current student and member of the proposed class.

**B.     Motion for Class Certification**

As set forth in the Second Amended Complaint, the Plaintiffs are seeking to certify a class consisting of "all past, present and future African-American female student athletes, who participate, seek to participate, or have been deterred or prevented from participating in athletic programs, including but not limited to Field Hockey and Lacrosse, because of the Philadelphia School District's discriminatory actions" in the (1) allocation of athletic participation opportunities; (2) allocation of financial resources; and (3) allocation of benefits. ECF No. 30 at ¶22.

**i.     Class Definition and Nature of the Class Claims**

Courts have routinely recognized that class certification in Title VI and Title IX athletic cases is appropriate, because the discrimination itself is inherently class-based and is measured on a program-wide rather than individual basis. *See P.V. v. Sch. Dist. of Philadelphia*, 289 F.R.D. 227 (E.D. Pa. 2013) (certifying class of plaintiffs alleging that the Pennsylvania Department of Education violated the IDEA by failing to tailor educational placements to the

child's individual needs); *Cohen v. Brown Univ.,* 991 F.2d 888, 893 (1st Cir. 1993) (certifying

class of "all present and future Brown University women students and potential students who

participate, seek to participate, and/or are deterred from participating in intercollegiate athletics

funded by Brown"); *Favia v. Indiana University of Pennsylvania,* 7 F.3d 332, 335-36 (3d Cir.

1993) (certifying class of "all present and future women students at I.U.P. who participate, seek

to participate, or are deterred from participating in intercollegiate athletics at the University").

      In particular, allegations of discrimination in Title IX athletic cases have to be examined

on a program-wide basis because school districts segregate their athletic teams by sex so females

and males are not given the opportunity to directly compete for the same opportunities or roster

spots.  The District expressly chooses how many athletic participation opportunities or roster

spots to provide to females and males by deciding which sports to offer for each sex at each of its

schools.  The District also expressly chooses how much money or financial support to provide to

females and males through its budgeting and allocation process.

      Thus, the District discriminates whenever it fails to provide equal athletic opportunities,

financial support, and benefits to its student athletes.  The District discriminates when it

intentionally chooses to allocate less opportunities and financial support to schools with majority

African-American populations.  The District discriminates when it restricts the African-

American females to stereotypical sporting opportunities and does not make the same types of

sports available to every female in the District.

      As illustrated above in Section V at pg. 12 to 16, since Title VI and Title IX athletic cases

are analyzed on program-wide basis, such cases are inherently class based.  The District either

violates Title VI and/or Title IX or it does not.  For example, the District either provides a

"substantially proportionate" number of athletic opportunities/roster spots to female students as a

group, or it does not. If the District does not, it is in violation of Title IX. If the District is in violation, pursuant to 34 C.F.R. § 106, it must add opportunities/roster spots. Similarly, the District either provides its female athletes with financial support "substantially proportionate" to their participation, or it does not. If the District does not it is in violation of Title IX. If the District is in violation, pursuant to 34 C.F.R. § 106, it must increase or reallocate its financial support.

Again, class certification is appropriate because the claims themselves require a review of how the District treats African-American female athletes as a class (as opposed to individuals) across the entire program as compared to how it treats male athletes as a class.

  **ii.**  **Class Certification Under Federal Rule Civil Procedure No. 23**

Federal Rule Civil Procedure No. 23(a) provides that a proposed class must satisfy four requirements:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23.

As former-Judge Posner described it, "[t]he class action is an ingenious procedural innovation that enables persons who have suffered a wrongful injury, but are too numerous for joinder of their claims alleging the same wrong committed by the same defendant or defendants to be feasible, to obtain relief as a group. . ." *Eubank v. Pella Corp.,* 753 F.3d 718, 719 (7th Cir. 2014). Further, by providing a single forum in which to litigate similar claims, a class action affords an indispensable mechanism for the conservation of judicial resources of federal courts.

*See Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983) ("Separate actions by each of the class members would be representative, wasteful, and an extraordinary burden on the courts.").

Despite the advantages inherent in a class action, as noted by the Third Circuit, class certification under Rule 23 "does not set forth a mere pleading standard." *Mielo v. Steak'n Shake Operations, Inc.*, 897 F.3d 467, 483–84 (3d Cir. 2018). In *Mielo*, the Third Circuit instructed the District Courts as follows:

> Given that class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," *Comcast Corp. v. Behrend*, 569 U.S. 27, 33, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)), a plaintiff wishing to bring a lawsuit in federal court must first satisfy the explicit requirements set forth in Rule 23(a). This calls for a rigorous analysis that usually requires courts to make factual findings and legal conclusions that overlap the underlying merits of the suit. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). Second, if the requirements of Rule 23(a) have been satisfied, the party seeking certification must also establish that her claim fits within one of the three types of class categories outlined in Rule 23(b). *Hydrogen Peroxide*, 552 F.3d at 309 n.6 (*citing General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 155, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).

*Id.* at 482. The Plaintiffs and the proposed class readily satisfy these requirements.

### 1. The Proposed Class is So Numerous that Joinder of All Class Members is Impracticable

The first requirement of Rule 23(a), known as numerosity, is satisfied when the number or nature of class members make their joinder as named plaintiffs impracticable. The standard does not require that joinder be impossible but that it would result in judicial hardship or inconvenience. In *Modafinil*, the Third Circuit observed that the relevant considerations include "judicial economy, the claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of class members, the geographic dispersion of class members, the ability to identify future claimants, and whether the claims are for injunctive relief or for damages." *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 252-253 (3d Cir. 2016).

Plaintiffs satisfy the numerosity requirement because (a) the number of potential class members is too large to make joinder practicable; (b) the specific identities of class members are too fluid and unknown to make their joinder possible; (c) it would be prohibitively expensive, inconvenient, and burdensome to litigants and the court for class members to join or bring separate actions, and (d) the size and nature of the claims is such that class certification is necessary to avoid the risk of inconsistent verdicts and/or the avoidance of injunctive relief.

### a.      Class Size

Rule 23(a)(1) does not require a plaintiff to offer direct evidence of the exact number and identities of the class members. *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 596–97 (3d Cir. 2012). Moreover, there is "[n]o minimum number of plaintiffs [] required to maintain a suit as a class action". *Mielo*, 897 F.3d at 486. A plaintiff in this circuit can generally satisfy Rule 23's numerosity requirement by establishing "that the potential number of plaintiffs exceeds 40." *Id. citing Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001).

In the absence of direct evidence, a plaintiff may use circumstantial evidence regarding the products, problems, parties, and geographic areas covered by the class definition to allow a District Court to make a factual finding. *Id.* The District Court may then rely on "common sense" to forgo precise calculations and exact numbers to support a finding of numerosity. *Id. citing In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. 450, 468, 510 (D.N.J.1997), aff'd *597 148 F.3d 283 (3d Cir.1998) (finding numerosity requirement satisfied without pinpointing an exact number because the evidence suggested a class of over 8,000,000 policyholders and "[c]ommon sense suggest [ed] that it would be at best extremely inconvenient to join all class members").

Here, the number of class members is large. The evidence shows that there are currently 8,411 females enrolled in the District, of which 62.13% are African-American. *See* Ex. C. As of the 2019-2020 school year there were 1,484 females playing on over 200 teams in the District. *Id.*

Further, as noted above, in order to come into compliance with Title IX, the District must keep all existing female teams and add more than 700 participation opportunities or roster spots. *Id.*

Further, based on the 2012-2013 data, once the District reaches participation equity it in all likelihood would have to add or reallocate more than $315,766.64 in financial support to the female teams. *See* Ex. D. Those additional funds would be shared by the existing female athletes plus the additional female athletes that were added to reach equity. Finally, when assessing whether the District provides male athletes with more or better benefits than it provides female athletes, the Court must examine how the District treats all female athletes; that is, the 1,484 current female athletes, and the additional female athletes necessary for equity.

The class size is much larger when all prospective and future incoming girl students are taken into account. The evidence shows that ever year 2,478 new female are enrolled in the District.[17] All of these individuals are members of the proposed class because all are harmed by or imminently will be harmed by the race and sex discrimination in the District's athletic department. There simply are too many females harmed by the District's discrimination to add them all as individual plaintiffs.

### b.      Prospective and Future Female Students

Joinder of all class members in the present action is also impracticable because the identities of many of the proposed class members are not and cannot currently be known. *See*

---

[17] https://www.philasd.org/performance/programsservices/open-data/school-information/#school_enrollment

*National Ass'n of Radiation Survivors v. Walters*, 111 F.R.D. 595, 599 (N.D.CaI. 1986) ("where the class includes unnamed, unknown future members, joinder of unknown individuals is impracticable and the numerosity requirement therefore met, regardless of class size").

While the names of the existing 1,484 female athletes are known to the District, the names of the prospective and future female students are not. The evidence shows that ever year 2,478 new females are enrolled in the District. However, it is completely unknown as to how many of those new female students will become female athletes in the District.

These unknown students are known to exist because the District continues to fill its freshman and transfer classes, and to fill its existing female athletic teams. Courts routinely certify classes such as this one which include future and prospective members. *See Stewart v. Abraham,* 275 F.3d 220, 227 (3d Cir. 2001); *Gomez v. Illinois State Bd. of Ed.*, 117 F.R.D. 394, 399 (N.D.III. 1987) (future students "are necessarily unidentifiable, and therefore, joinder is clearly impracticable").

Joinder is also impracticable because of the inherently fluid nature of the proposed class. Its members have already changed during the course of the litigation and will continue to do so as new female students enroll in the District and others dropout, transfer, or graduate. More than 2,478 of the class members change each and every year simply because of the nature of academic programs. *See Santiago v. City of Philadelphia*, 72 F.R.D. 619, 624 (E.D.Pa. 1976) (constant rotation of juveniles through youth study center made joinder impracticable in an action challenging the legality of the center's policies); *Atkins v. Toan*, 595 F.Supp. 104, 105 (W.D.Mo. 1984) (joinder impracticable when class membership is fluid); *Jane B. v. New York City Dept. of Social Services,* 117 F.R.D. 64, 70 (SDNY 1987) (joinder made impracticable by the "fluid compositions" of the defendant juvenile centers); *Arthur v. Starrett City Assoc.*, 98

F.R.D. 500, 505-506 (EDNY 1983) (fluctuating class membership weighs in favor of class certification); *Folsom v. Blum*, 87 F.R.D. 443, 445 (SDNY 1980); *Von Collin v. County of Ventura*, 189 F.R.D. 583, 590 (C.D.Cal. 1999) (identity of pretrial detainees fluctuates over time).

### c.   Expense and Burden

It would be expensive, inconvenient, and highly burdensome to litigants and the Court if each victim of the District's race and sex discrimination filed her own lawsuit — or even if each such victim joined as a named plaintiff. The oldest class members are 19 years old. The prospective and future class members are all minors. All of the proposed class members are young and lack the time, financial resources, and legal sophistication to file separate claims.

It is undisputed that Federal court litigation is expensive. Filing separate actions would unnecessarily increase that cost, even if such plaintiffs could find counsel who have experience and who are willing to rely on Section 1988 for fees. It would be unnecessarily burdensome for the court to manage several different suits that challenge the exact same discriminatory practices. *See United States v. Sielaff*, 546 F.2d 218, 222 (7th Cir. 1976) (class certification appropriate to avoid multiple lawsuits and to protect those who, "by reason of ignorance, poverty, illness, or lack of counsel" are unable to bring an action on their own behalf).

The prospect of retaliation also makes it more difficult for individual plaintiffs to come forward to enforce their rights. Young students face intimidation, ostracism, and retaliation for speaking out against their schools, especially where there is the concern that popular male sports may have to be cut to make room for new female teams. This reasonable fear weighs in favor of including all prospective plaintiffs as members of the class and of remedying all the

discrimination they face in a single class action. *See United States Fidelity & Guaranty Co. v. Lord*, 585 F.2d 860, 870 (8th Cir. 1978).

### d.   Nature of The Claims

The nature of the class claims makes certification appropriate because the requested injunctive relief inherently affects all members of the class. Without class certification, all parties will risk the entry of inconsistent verdicts now and over time.  Class certification is especially appropriate in this case as the only means to effectively remedy the Defendants' systemic, ongoing discrimination against African-American female students. Without class certification, the District will be allowed to avoid the injunctive relief necessary to compel Title VI and Title IX compliance and to continue or resume its discrimination upon the graduation of the named Plaintiffs. *See Cook v. Colgate University*, 992 F.2d 17, 19 (2nd Cir. 1993) (discussing the need for class certification to avoid inevitable mootness claims in education cases).

Thus, the Plaintiffs have satisfied their burden of showing numerosity.

### 2.   Common Questions of Law and Fact Apply to The Class

The second requirement under Rule 23, known as commonality, is that the Plaintiffs claims share common questions of law or fact.  *See Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Although courts often consider the existence of common questions in conjunction with consideration of whether common questions predominate over individual issues, the commonality requirement under Rule 23(a)(2) focuses only on whether common issues of law or fact exist.

However, this rule does "not require identical claims or facts among class member[s]." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 597 (3d Cir. 2012).  Nor should the emphasis be on the number of common questions. *See Wal–Mart Stores*, 564 U.S. at 350–59. The emphasis

when considering commonality is on the sufficiency of the putative class as a whole. *See O'Dell v. Nat'l Recovery Agency,* 291 F. Supp. 3d 687, 698 (E.D. Pa. 2018) *citing Kline v. Security Guards, Inc.,* 196 F.R.D. 261, 270 (E.D. Pa. 2000) ("[T]he numerosity and commonality requirements...evaluate the sufficiency of the class itself....").

As the Third Circuit has made clear, determining commonality should not be a high bar and "[e]ven a single [common] question will do," so long as "a classwide proceeding [is capable of] generat[ing] common answers apt to drive the resolution of the litigation." *Id.* at 350-359.  In *O'Dell*, this Court agreed that the commonality requirement was met because "there are common factual questions and there is a common legal question" [and] "the answer to the common legal question, whether NRA's inaccurate date-reporting violates the FDCPA, will generate a common answer that will likely resolve all the class members' claims."  291 F. Supp. 3d at 698.

It should be noted that the commonality requirement can be satisfied without needing to demonstrate that all plaintiffs are harmed in identical ways. *See Doe v. Los Angeles Unified Sch. Dist.,* 48 F. Supp. 2d 1233, 1242 (C.D. Cal. 1999) (certifying an ELL class challenging a state initiative restricting the use of bilingual education to teach LEP students, brought under common claims of Title VI of the Civil Rights Act of 1964 and § 1703(f) of the EEOA and noting that when "class members share a general, common violation . . . a court may employ a liberal definition of commonality"); *Keyes v. Sch. Dist. No. 1, Denver, Colo.,* 576 F. Supp. 1503 (D. Colo. 1983) (finding commonality on the issue of whether the school district had denied the class equal protection of the laws, and whether defendant had failed to follow requirements of Title VI of the Civil Rights Act of 1964 and § 1703(f) of the EEOA).

Here, the claims of all proposed class members include the same legal questions of whether the District engaged in race and/or sex discrimination and violated Title VI and/or Title

IX in: (1) the allocation of athletic participation opportunities; (2) the allocation of athletic financial support; and (3) the allocation of benefits between male and female teams. As set forth above, these claims are inherently class-based because they require a program-wide comparison of how the District treats its sex-segregated male and female teams.

The common factual questions in the case, the answers of which will determine the outcome of the case, include but are not limited to the following:

(a)    How many legitimate athletic participation opportunities does the District provide to male and female students?;

(b)    How many of these opportunities may be counted under Title IX?;

(c)    How much financial support does the District provide to male and female athletes?;

(d)    Does the District distribute its financial support equitably between among male and female athletes?;

(e)    Which athletic benefits (such as equipment, supplies, uniforms, coaching, facilities, locker rooms, travel, academic support, publicity, medical and training services, strength and conditioning services, recruiting support) does the District provide to male and female athletes?; and

(f)    Does the District provide comparable benefits to female athletes?

The common legal questions in the case, the answers of which will determine the outcome of the case, include but are not limited to the following:

(a)    Does the District provide a "substantially proportionate" number of athletic opportunities or roster spots to female students?

(b)    Does the District provide its female athlete with financial support "substantially proportionate" to their participation?

(c)    Does the District can provide more or better benefits to the athletes on the boys' teams then those on the female teams?

(d)    Does the District discriminate between schools with higher percentage of African-American female athletes?

29

As noted above, Title VI and Title IX athletic discrimination cases inherently involve such common question of law and fact because the discrimination is carried out or directed on a program-wide basis.  For example, all members of the proposed class are harmed by or imminently will be harmed by the race and/or sex discrimination in the District's athletic department. All members of the proposed class seek the same equitable remedy — which depends on a finding that the District's athletic program has discriminated against African-American female athletes — compliance with Title IX.  All members of the proposed class will benefit from relief granted in this case.

Thus, the proposed class satisfies the commonality requirements of Rule 23(a)(2).

### 3.    The Class Representatives' Claims are Typical of Those of The Class

The third requirement of Rule 23(a), commonly referred to as typicality, is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). "Typicality entails an inquiry into whether the named plaintiff's individual circumstances are markedly different or...the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *O'Dell*, 291 F. Supp. 3d at 698–99 *citing Hassine v. Jeffes,* 846 F.2d 169, 177 (3d Cir. 1988).

The requirement is usually met when the representative plaintiffs are subject to the same policies as the putative class members. *See Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993) ("When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims.")

Accordingly, the typicality requirement is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to

prove the defendant's liability. *Robinson v. Metro-North Commuter R. R. Co.,* 267 F.3d 147, 155 (2d Cir. 2001). In essence, typicality "requires that the disputed issue of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of the other members of the proposed class." *Caridad v. Metro-North Commuter R.R.,* 191 F.3d 283, 293 (2d Cir. 1999).  For example, in *O'Dell* this Court reasoned that the typicality was met because of the following:

> Factually, O'Dell's claim as it relates to this legal theory is substantially similar, if not identical, to the claims of the other class members. Legally, both O'Dell and the class members need to show that improperly aging accounts is a violation of the FDCPA. While it is unclear whether O'Dell and the class members need to show that NRA intended to re-age the accounts or whether this is a strict liability violation, the court can find no reason why O'Dell would pursue a different legal theory than the other class members.

*Id.* at 699.

Factual differences do not defeat typicality "if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the absent class members, and if it is based on the same legal theory." *Stewart*, 275 F.3d at 227-28; *see also Hassine*, 846 F.2d at 177-78 (stating that like commonality, the typicality requirement "mandates only that complainants' claims be common, and not in conflict."). As the Third Circuit has noted: "even relatively pronounced factual differences will generally not preclude a finding of typicality where there is strong similarity of legal theories." *Baby Neal*, 43 F.3d at 58.

Here, the named Plaintiffs' claims are not just typical of the class claims, they are identical: (1) they were or are being denied an equal opportunity to participate in athletics in the District; (2) they were or are being denied an equal allocation of athletic financial support; and (3) they were or are being denied an equal allocation of the treatment and benefits provided to athletes in the District.

The Plaintiffs and all members of the proposed class were or are subject to or soon will be subjected to and harmed by the same systemic, ongoing race and sex discrimination in the District's athletic department.  The Plaintiffs and all members of the proposed class have Title VI and Title IX claims based upon the same legal theories and all seek and the same relief. The Plaintiffs and all members of the proposed class want to participate in athletics, receive the same financial support, and receive the same athletic benefits that the men's teams already receive.

Thus, the Plaintiffs have satisfied their burden of showing typicality.

### 4. The Named Plaintiffs and Their Counsel are Adequate Class Representatives

The fourth requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). This requires Plaintiffs to demonstrate both that their attorneys are competent to handle the litigation and that the named Plaintiffs do not have interests that are antagonistic to the class.

### a. Class Counsel

The undersigned counsel is competent to handle the class claims in this action. All have litigated class action claims in federal court. Attorney Glenn Ellis has litigated various types of class actions, including employment, education, contamination, TCPA, and medical monitoring cases, in federal courts for more than 15 years.

### b. Class Representatives

Two factors generally inform whether class representatives satisfy the Rule 23(a)(4) requirement: "(1) absence of conflict and (2) assurance of vigorous prosecution." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625-26, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (holding that a class representative must be part of the class and possess the same interest and suffer the same injury as the class members);

32

Here, the named Plaintiffs will fairly, adequately, and vigorously represent the interests of the class. They do not have interests antagonistic to the interests of the members of the class. They have been subjected to the same discrimination. The Plaintiffs want to stop the District from eliminating any women's teams and to compel the District to add more women's teams until the school reaches equity under Title VI and Title IX. The Plaintiffs want to require the District to equitably allocate athletic financial support and they want to make sure that all female athletes receive the same athletic benefits that male athletes receive (commensurate with their particular sports). The named Plaintiffs are not aware of any interests that may be antagonistic to those of the proposed class and do not expect that any will arise.

**B.     The Proposed Class Satisfies Federal Rule of Civil Procedure No. 23(b)(1)**

Class certification under Rule 23(b)(1) is properly used where the opposing party will be otherwise at risk of being subjected to incompatible duties or if separate lawsuits were decided differently so as to result in "incompatible standards". Fed.R.Civ.P. 23(b)(1)(a) advisory committee's note.

Here, since the District's athletic program is managed centrally out from its Athletic department it is obligated to treat all its students alike. Failure of this Court to certify this case may lead to inconsistent outcomes. For example, if different Title IX actions brought by different female students reached different conclusions, the District and its students would face inconsistent orders — one telling the District it must add opportunities for females and another telling the District the opposite, which would result in a different standards across the District.

Class certification under Rule 23(b)(1) would allow for an examination and determination as to the District's athletic program as a whole and would avoid the confusion of inconsistent outcomes.

33

**C.      The Proposed Class Satisfies Federal Rule of Civil Procedure No. 23(b)(2)**

This also action falls squarely under Rule 23(b)(2) which permits class action status where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  A Rule 23(b)(2) "class action is intended for cases where broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury." *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147 (2d Cir. 2001) *quoting* Fed. R. Civ. P. 23(b)(2), Advisory Committee note (b)(2); 7A Wright & Miller §1776 ("subdivision (b)(2) was added to Rule 23 in 1966 in part to make it clear that civil rights suits for injunctive or declaratory relief can be brought as class actions").

Class actions under Rule 23(b)(2) are appropriate whenever a class primarily seeks declaratory or injunctive relief based upon the acts or omissions of a defendant with respect to the class as a whole. The Rule's advisory committee notes states that the Rule is satisfied "even if the action or inaction has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class." Thus, even if only the named Plaintiffs or even if only some of the District's female athletes were subjected to its sex discrimination, this action would satisfy the requirements of Rule 23(b)(2) because the District's discriminatory policies and actions are generally applicable to all members of the prospective class.

In the Third Circuit, injunctive relief must predominate in order for a class to be certified under Rule 23(b)(2). Thus, an examination of the relief sought is integral to determining whether an action is "appropriate" for final injunctive relief or declaratory relief. The requirement that injunctive relief predominate is intended "to ensure a degree of cohesiveness that would

otherwise be easily disrupted when a plaintiff class seeks monetary remedies, since monetary remedies 'are more often related directly to the disparate merits of individual claims.'" *See Parker v. Time Warner Entertainment Co., L.P.,* 198 F.R.D. 374, 378 (E.D.N.Y. 2001).

Claims of discriminatory treatment are particularly tailored to injunctive relief. A Rule 23(b)(2) class "serves most frequently as the vehicle for civil rights actions and other institutional reform cases that receive class action treatment." *Baby Neal v. Casey*, 43 F.3d 48, 58-59 (3d Cir. 1994). Indeed, Rule 23(b)(2) was "designed for civil rights cases seeking broad declaratory or injunctive relief for a numerous and often ascertainable or amorphous class of persons." *Barnes v. The American Tobacco Company,* 161 F.3d 127 (3d Cir. 1998) *citing* Conte, 1 Newberg on Class Actions 3d 4.11.

In order to effectively eradicate such discrimination and to implement the broad remedial purposes of civil rights statutes, courts liberally apply all the requirements of Rule 23 to such cases. *See Gay v. Waiters' and Dairy Lunchmen's Union,* 549 F.2d 1330, 1333 (9th Cir. 1977) (court reversed district court's denial of class certification because it failed to consider broad remedial purposes of Title VII); *Cannon v. University of Chicago*, 441 U.S. 677, 706 (1979) (discusses broad remedial purpose of Title IX).

Here, Plaintiffs are entitled to a declaration that the District engages in race and sex discrimination and violates Title VI and Title IX because the District either violates Title VI and/or IX as to all of its African-American female students or it does not — there can be no finding that the District violates Title VI and/or Title IX as to only some female athletes. Moreover, all class members are entitled to the same injunctive relief: (1) to restrain the District from eliminating female sports teams and/or to require the District to add more female sports

teams, (2) to require the District to allocate more athletic financial support to female athletes, and (3) to provide female athletes with the same treatment and benefits provided to male athletes.

Because Defendants have acted in a discriminatory manner with respect to all class members, and because the named Plaintiffs seek declaratory and injunctive relief to remedy that discrimination, the proposed class is properly certifiable under Rule 23(b)(2).

## VII.   CONCLUSION

WHEREFORE, based on the foregoing, Plaintiffs move this Court for entry of an Order:

1.   Allowing Plaintiff Richard Jean to substitute his younger daughter D.J. as class representative;

2.   Certifying this litigation as a class action pursuant to Fed.R.CivI.P 23(a) and 23(b)(1) and (2) on behalf of a class defined as follows: all past, present and future African-American female student athletes, who participate, seek to participate, or have been deterred or prevented from participating in athletic programs, including but not limited to Field Hockey and Lacrosse, because of the Philadelphia School District's discriminatory actions in the (1) allocation of athletic participation opportunities; (2) allocation of financial resources; and (3) allocation of benefits;

3.   Appointing the named Plaintiffs as representatives of the class;

4.   Appointing the undersigned counsel as class counsel, pursuant to Fed.R.Civ.P. 23(g); and

5.   Granting such other relief as the Court deems just.

Respectfully submitted,

**FREIWALD LAW, P.C.**

By: _____

GLENN A. ELLIS, ESQUIRE
Attorney for Plaintiffs

Date:  February 12, 2020

36

## CERTIFICATE OF SERVICE

I, Glenn A. Ellis, hereby certify that a copy of Plaintiff's Motion to Substitute Class

Representative and for Class Certification was served by the Court's electronic filing system

upon the following:

> Bonnie M. Hoffman, Esquire
> Hangley Aronchick Segal Pudlin & Schiller
> One Logan Square, 27th Floor
> Philadelphia, PA  19103

GLENN A. ELLIS, ESQUIRE

Date:  February 12, 2020

James Patrick Lynch

```
 1         IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                      - - -
    NADIRAH MCRAE,           :
 3  Individually and as      :
    Class Representative,:
 4  and RICHARD JEAN as      :
    the parent and           :
 5  guardian of D.J.,        :
    Individually and as      :
 6  Class Representative,:
         Plaintiffs          :
 7            v.             : No. 2:17 cv-04054-PBT
    THE SCHOOL REFORM         :
 8  COMMISSION and SCHOOL:
    DISTRICT OF              :
 9  PHILADELPHIA             :
10                      - - -
                December 11, 2019
11                      - - -
12
13         Oral deposition of JAMES PATRICK LYNCH,
14     taken pursuant to notice, was held at
15     Freiwald Law, 1500 Walnut Street,
16     Suite 1801, Philadelphia, Pennsylvania
17     19102, beginning at 8:59 a.m., on the
18     above date, before Joy Shindell, a
19     Professional Court Reporter and Notary
20     Public in the Commonwealth of
21     Pennsylvania.
22                                    EXHIBIT
23                                       A
24
```

James Patrick Lynch

```
 1    school districts they'll say, well, 30
 2    percent of the way there or 40 percent of
 3    the way there?
 4    A.   Correct.  Yes.
 5    Q.   And then they actually have a list of
 6    schools that have never filled out the
 7    survey, correct?
 8    A.   Yes.
 9    Q.   And the School District of
10    Philadelphia is one of those school
11    districts that has never filled out the
12    survey, correct?
13    A.   I can't speak before I arrived in
14    2016.
15    Q.   How about from 2016 until today, have
16    you ever provided any information beyond
17    just the basic enrollment numbers for the
18    high schools?
19            MS. HOFFMAN:  Objection.
20            THE WITNESS:  We provided the
21        name, the school number.  We provided
22        the name of the compliance officer,
23        the name of myself, who is completing
24        the form, and then we would make the
```

James Patrick Lynch

1         selections as accordingly.

2    BY MR. ELLIS:

3    Q.   But you have never provided

4    information, for example, on athletic

5    participation by gender, race and

6    ethnicity, correct?

7    A.   Correct.

8    Q.   You never provided any information on

9    how much money the district spends on

10   athletic facilities, equipment, coaching by

11   gender, correct?

12   A.   Can I explain why?

13   Q.   That is actually going to be my next

14   question, after you answer.

15        You have never provided that

16   information, right?

17   A.   Yes.

18   Q.   Why have you not provided that

19   information?

20   A.   So at this form that you have put in

21   front of me, this has to be filled out in

22   its entirety for the Pennsylvania

23   Department of Education to accept it.  It's

24   through algorithms and things like.

James Patrick Lynch

1        We cannot fill out every single part

2    of this form because this form is not

3    really inclusive of a large urban school

4    district.  It's more for your more smaller

5    rural school districts where you can fill

6    out everything.

7        So although we can fill out many

8    different sections of this, there are

9    sections where we cannot fill out.  And the

10   PDE, it's called the PIMS submission, they

11   will not accept this.

12       So for us to go through a very

13   laborsome process filling everything out

14   and them not accepting it would be

15   counterproductive.  I believe that is what

16   happened when they tried to submit it

17   previously prior to my arrival.

18    Q.  Are you aware that the Pittsburgh

19   School District has completed and submitted

20   theirs?

21    A.  I am, yes.

22    Q.  But you are saying that Philadelphia

23   is too complicated to express, as they have

24   asked you to, on this survey?

James Patrick Lynch

1   will know there was not enough players.   So

2   we do have certain things that are notified

3   to us if there are inadequate numbers.

4    Q.   And you said this is what you do every

5   day, correct?

6             MS. HOFFMAN:   Objection.

7             THE WITNESS:   Can you just be

8        more clear?   What is it I do every

9        day?

10   BY MR. ELLIS:

11    Q.   Seeing this information, taking in

12   this information, compiling it, reviewing

13   it; that is basically the function of your

14   office, correct?

15             MS. HOFFMAN:   Objection.

16             THE WITNESS:   What information?

17   BY MR. ELLIS:

18    Q.   Participation numbers, payroll for

19   coaches, officiating payments; all the

20   information that is kept on ArbiterSports?

21             MS. HOFFMAN:   Objection.

22   BY MR. ELLIS:

23    Q.   That's one of the essential functions

24   of your office, correct, in showing that

James Patrick Lynch

1    the program is being run correctly

2    throughout the district, the athletic

3    program, correct?

4              MS. HOFFMAN:  Objection.

5              THE WITNESS:  Yes.

6    BY MR. ELLIS:

7     Q.  And central to that is making sure

8    that you are adhering to providing equal

9    opportunities to boys and girls throughout

10   the district, correct?

11             MS. HOFFMAN:  Objection.

12             THE WITNESS:  Yes.

13             MR. ELLIS:  This is a good time

14        to take a break.

15                  - - -

16             (Whereupon, a recess was taken.)

17                  - - -

18   BY MR. ELLIS:

19    Q.  Based on your review and based on your

20   experience and your position, is it your

21   understanding that the number of male and

22   female athletic participation opportunities

23   are substantially proportionate throughout

24   the school district?

James Patrick Lynch

```
1            MS. HOFFMAN:  Objection.

2            THE WITNESS:  Can you repeat

3      that?

4  BY MR. ELLIS:

5   Q.  Throughout the school district, are

6  the number of female and male participants

7  in athletics substantially proportionate?

8  I don't mean identical, but pretty close.

9            MS. HOFFMAN:  Objection.

10           THE WITNESS:  I guess you have

11     information you want to show me.

12  BY MR. ELLIS:

13  Q.  I just want to know what your

14  understanding is as the athletic director.

15      Are the numbers of female and male

16  athletic participants substantially

17  proportionate to each other?  If you don't

18  know, that's fine.

19  A.  I can't answer that.

20  Q.  That's fine.

21      You told us earlier that you did

22  review the Complaint, correct?

23  A.  Yes.

24  Q.  And according to your review of the
```

James Patrick Lynch

1        prongs.

2   BY MR. ELLIS:

3    Q.  Let's go to the first prong,

4   substantial proportionality.

5        Do you know whether or not there is

6   substantial proportionality across the

7   district between male and female

8   participants?

9            MS. HOFFMAN:  Objection.  Calls

10       for a legal conclusion.

11            THE WITNESS:  I can't accurately

12       answer that.

13   BY MR. ELLIS:

14    Q.  Do you know whether or not the school

15   district has a history of adding sports,

16   female sports teams, at any of the four

17   schools we just discussed?

18    A.  Yes, we do have a history of adding

19   those teams.  Again, two of those schools

20   are not under my purview.  I do not have

21   responsibility for them.

22    Q.  Delaware Valley closed and Mastery

23   Shoemaker is a charter school, correct?

24    A.  Mastery Shoemaker is a charter school,

| Table 1 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2012-2013 School Name | Total Student Body | Females | Males | Total Roster Spots | Varsity Female Roster Spot Count | JV Female Roster Spot Count | Varsity Male Roster Spot Count | JV Male Roster Spot Count | Total Number of Sports | Title IX % | African American % | Econ. Disadv. % (2011) |
| Strawberry Mansion High School | 411 | 211 | 220 | 131 | 66 | | 56 | 8 | 8 | 3.22% | 98% | 90.00% |
| Samuel Fels High School | 1362 | 622 | 740 | 390 | 113 | | 239 | 38 | 16 | 26.70% | 94% | 74.00% |
| High School of the Future | 399 | 198 | 201 | 135 | 53 | 15 | 67 | 7 | 7 | 6.00% | 84% | 84.00% |
| Roxborough High School | 476 | 222 | 254 | 210 | 77 | | 90 | 43 | 13 | 10.00% | 75% | 70.00% |
| Abraham Lincoln High School | 1731 | 802 | 929 | 408 | 115 | 12 | 186 | 85 | 22 | 14.00% | 33% | 74.00% |
| Overbrook High School | 996 | 437 | 559 | 283 | 76 | | 148 | 39 | 14 | 13.52% | 98% | 84.00% |
| Thomas A. Edison High School | 1254 | 574 | 680 | 281 | 57 | | 132 | 12 | 12 | 17.50% | 17% | 93.00% |
| West Philadelphia High School | 813 | 353 | 461 | 264 | 91 | 12 | 149 | 13 | 15 | 4.70% | 97% | 83.00% |
| Constitution High School | 380 | 209 | 171 | 91 | 53 | | 38 | | 5 | 8.00% | 68% | 22.00% |
| Martin Luther King High School | 760 | 324 | 436 | 224 | 71 | | 118 | 12 | 12 | 11.00% | 96% | 89.28% |
| Swenson Arts and Technology High School | 693 | 249 | 444 | 135 | 59 | | 76 | 8 | 8 | 3.11% | 31% | 59.00% |
| Frankford High School | 1387 | 580 | 807 | 341 | 128 | | 193 | 18 | 18 | 5.60% | 54% | 84.00% |
| Fenom High School | 559 | 238 | 321 | 125 | 17 | | 94 | 14 | 6 | 28.00% | 28% | 75.00% |
| South Philadelphia High School | 626 | 260 | 366 | 286 | 67 | | 111 | 38 | 11 | 10.50% | 37% | 84.00% |
| John C. Motthuam High School | 680 | 323 | 357 | 276 | 103 | 13 | 126 | 34 | 16 | 3.50% | 37% | 83.00% |
| Benjamin Franklin High School | 544 | 243 | 301 | 230 | 69 | | 109 | 52 | 11 | 13.00% | 79% | 89.00% |
| George Washington High School | 1866 | 833 | 1033 | 407 | 169 | 1 | 260 | 91 | 22 | 8.90% | 27% | 58.00% |
| Northeast High School | 2908 | 1263 | 1662 | 528 | 155 | 50 | 238 | 83 | 23 | 3.00% | 33% | 59.00% |
| A. Philip Randolph Career and Technical High School | 539 | 200 | 339 | 107 | 60 | | 47 | | 6 | 0.00% | 99% | 84.00% |
| Paul Robeson High School for Human Services | 265 | 164 | 101 | 91 | 53 | | 38 | | 5 | 3.40% | 94% | 74.00% |
| William L. Sayre High School | 505 | 237 | 268 | 72 | 21 | 15 | 21 | 15 | 5 | 0.00% | 97% | 83.00% |
| | 19176 | 8575 | 10701 | 4433 | 1667 | 118 | 2500 | 638 | 255 | | | |



EXHIBIT
B

# Table 2

| 2019-2020 School Name | Total Student Body | Females | Males | Total Roster Spots | Varsity Female Roster Spot Count | JV Female Roster Spot Count | Varsity Male Roster Spot Count | JV Male Roster Spot Count | Total Number of Sports | Title IX % | African American % | Econ. Disadv. % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Strawberry Mansion High School | 166 | 81 | 85 | 106 | 12 | | 47 | 47 | 5 | 37.40% | 92.77% | 81.82% |
| Merrell Dobbins Career and Technical High School | 797 | 473 | 324 | 186 | 68 | | 81 | 47 | 11 | 24.70% | 86.01% | 82.81% |
| Samuel Fels High School | 935 | 460 | 511 | 202 | 52 | | 103 | 47 | 12 | 20.10% | 53.43% | 68.40% |
| High School for the Future | 558 | 276 | 282 | 210 | 56 | 16 | 91 | 47 | 12 | 15.20% | 90.32% | 69.05% |
| Roxborough High School | 776 | 323 | 452 | 164 | 52 | | 79 | 63 | 11 | 15.32% | 84.08% | 66.11% |
| Abraham Lincoln H.S. School | 1963 | 865 | 1098 | 320 | 80 | 28 | 133 | 79 | 20 | 10.20% | 36.58% | 47.78% |
| Overbrook High School | 473 | 210 | 263 | 192 | 52 | | 93 | 47 | 11 | 17.30% | 93.87% | 79.83% |
| Thomas A. Edison High School | 1077 | 447 | 630 | 171 | 51 | 16 | 75 | 28 | 11 | 1.80% | 31.48% | 80.45% |
| West Philadelphia High School | 418 | 165 | 253 | 212 | 40 | 12 | 113 | 47 | 12 | 13.59% | 92.85% | 77.39% |
| Constitution High School | 341 | 228 | 155 | 136 | 56 | 16 | 52 | 12 | 10 | 6.30% | 67.19% | 60.60% |
| Martin Luther King High School | 519 | 216 | 303 | 106 | 68 | | 31 | 47 | 11 | 7.00% | 33.45% | 73.69% |
| John Bartram High School | 545 | 237 | 308 | 107 | 28 | | 79 | 6 | | 13.58% | 83.06% | 70.48% |
| Swenson Arts and Technology High School | 626 | 240 | 386 | 272 | 28 | 12 | 124 | 44 | 6 | 0.00% | 27.16% | 54.57% |
| Frankford High School | 952 | 398 | 544 | 96 | 56 | | 28 | 16 | | 0.00% | 46.12% | 58.61% |
| Kensington High School | 712 | 252 | 452 | 96 | 40 | | 28 | 7 | | 0.00% | 18.48% | 64.42% |
| South Philadelphia High School | 493 | 163 | 330 | 250 | 68 | 16 | 44 | 14 | 14 | 0.00% | 26.29% | 53.00% |
| John E. Masterman High School | 607 | 250 | 357 | 358 | 68 | 12 | 128 | 15 | 10 | 9.50% | 49.00% | 59.35% |
| Benjamin Franklin High School | 451 | 212 | 378 | 151 | 56 | | 91 | 12 | 9 | 4.30% | 45.32% | 80.63% |
| George Washington High School | 1371 | 219 | 258 | 198 | 36 | 12 | 47 | 63 | 9 | 14.60% | 8.12% | 76.79% |
| Northeast High School | 1356 | 618 | 778 | 160 | 112 | 44 | 141 | 63 | 22 | 3.64% | 28.60% | 32.66% |
| Philadelphia Military Academy | 1447 | 1412 | 2055 | 966 | 112 | 56 | 140 | 79 | 25 | 0.00% | 28.01% | 65.32% |
| A. Philip Randolph Career and Technical High School | 315 | 146 | 169 | 24 | 12 | | 12 | | 2 | 0.00% | 87.14% | 74.67% |
| Penn Treaty High School | 370 | 122 | 248 | 74 | 28 | | 46 | | 5 | 0.00% | 88.39% | 72.42% |
| Paul Robeson High School for Human Services | 349 | 147 | 202 | 24 | 12 | | 12 | 1 | 1 | 6.00% | 38.40% | 79.40% |
| William L. Sayre High School | 312 | 177 | 135 | 12 | | | 12 | 1 | 1 | 4.80% | 53.57% | 68.26% |
| | 19,583 | 8,411 | 11,172 | 4,864 | 1,244 | 248 | 1,862 | 938 | 267 | 0.00% | 60.53% | 70.77% |


EXHIBIT C
tabbles

## Table 3

| School Name | Sport | Boys | Girls | Total Students | No. Competitions (Total) | No. Competitions (Three) | No. Grades (Staar) | No. Grades (Assistant) | Trainer (% of Time) | Athletic Trainer (Total Annual) | Head Coach Compensation (Fall) | Head Coach Compensation (Winter) | Head Coach Compensation (Spring) | Travel Expenditure | Uniform Expenditure | Supplies & Equipment Expenditure | Facilities Expenditure | Other Expenditure | Annual Team Total Expenditure |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|



EXHIBIT D

tabbies