**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| NADIRAH MCRAE, Individually and as Class Representative, and RICHARD JEAN as the parent and guardian of D.J., Individually and as Class Representative, | : : : : : | Civil Action No. 17-cv-4054 |
| *Plaintiffs,* | : : : | |
| v. | : : : | |
| SCHOOL DISTRICT OF PHILADELPHIA, | : : : | |
| *Defendants.* | : : | |

**DEFENDANT THE SCHOOL DISTRICT OF PHILADELPHIA'S
RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO
SUBSTITUTE CLASS REPRESENTATIVE AND FOR CLASS CERTIFICATION**

Dated:  March 11, 2020

**HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER**
Bonnie M. Hoffman
Adam N. Schupack
One Logan Square, 27th Floor
Philadelphia, PA  19103
215.568.6200
bhoffman@hangley.com
aschupack@hangley.com

*Attorneys for Defendant The School District of Philadelphia*

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND .................................................................................................. 2

      A.   The Requirements of Title VI and Title IX. ............................................... 2

      B.   Procedural History ..................................................................................... 3

      C.   Factual Background .................................................................................... 5

           1.   The Plaintiffs .................................................................................... 5

           2.   The District ....................................................................................... 6

           3.   The District's Interscholastic Athletics Program ............................. 7

III.  ARGUMENT ....................................................................................................... 11

      A.   For a Class to be Certified, At Least One Named Plaintiff Must Meet the
           Jurisdictional Requirements For Maintaining the Class; Here, Neither Do. .............. 11

           1.   Plaintiffs Lack Standing to Seek Injunctive Relief. ........................ 11

           2.   Plaintiffs' Claims for Injunctive Relief are Also Moot. ................... 12

           3.   Plaintiffs' Motion to Substitute Named Plaintiff Is Untimely and Would
                Unduly Prejudice the District .......................................................... 14

      B.   Plaintiffs' Motion for Class Certification Does Not Otherwise Meet the
           Requirements Necessary for Class Certification. ...................................... 18

           1.   Plaintiffs Have the Burden of Establishing Their Entitlement to Class
                Certification, and the Court Must Undertake a Rigorous Analysis of
                Plaintiffs' Evidence. ........................................................................ 18

           2.   Plaintiffs Have Provided No Evidence Whatsoever that the District
                Engaged in Intentional Discrimination, And Have Failed to Meet Their
                Burden to Certify a Title VI Class. .................................................. 19

           3.   Plaintiffs Rely on Significantly Flawed Data in an Attempt to Create the
                Misimpression That the District Violates Title IX. .......................... 22

           4.   Plaintiffs' Proposed Class Definition Is Unclear and Imprecise. ..... 24

           5.   Plaintiffs Have Not Met Their Burden of Producing Evidence that Could
                Meet the Certification Prerequisites in Rule 23(a). ......................... 26

           6.   Plaintiffs Have Not Met Their Burden Under Federal Rules of Civil
                Procedure 23(b)(1) or 23(b)(2). ....................................................... 35

IV.   CONCLUSION ................................................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ................................................................................................19, 20

*Barnes v. American Tobacco Co.*,
161 F.3d 127 (3d Cir. 1998) ...............................................................................................36

*Beck v. Maximus, Inc.*,
457 F.3d 291 (3d Cir. 2006) ...............................................................................................34

*Montgomery County, Pa. ex rel. Becker v. MERSCORP, Inc.*,
298 F.R.D. 202 (E.D. Pa. 2014) ..........................................................................................12

*Blunt v. Lower Merion School District*,
262 F.R.D. 481 (E.D. Pa. 2009),
*aff'd*, 767 F.3d 247 (3d Cir. 2014) ......................................................................................24

*Blunt v. Lower Merion School District*,
767 F.3d 247 (3d Cir. 2014) ...............................................................................................19, 20

*Bougher v. University of Pittsburgh*,
713 F. Supp. 139 (W.D. Pa.),
*aff'd*, 882 F.2d 74 (3d Cir. 1989) ........................................................................................3

*In re Brewer*,
863 F.3d 861 (D.C. Cir. 2017) ...........................................................................................15

*Brown v. Philadelphia Housing Authority*,
350 F.3d 338 (3d Cir. 2003) ...............................................................................................12, 13

*In re Comunity Bank of Northern Virginia*,
418 F.3d 277 (3d Cir. 2005) ...............................................................................................18

*In re Community Bank of Northern Virginia Mortgage Lending Practices Litigation*,
795 F.3d 380 (3d Cir. 2015) ...............................................................................................33

*Dewey v. Volkswagen Aktiengesellschaft*,
681 F.3d 170 (3d Cir. 2012) ...............................................................................................33

*Equity In Athletics, Inc. v. Department of Education*,
639 F.3d 91 (4th Cir. 2011) ...............................................................................................3

*Favia v. Indiana University of Pennsylvania*,
7 F.3d 332 (3d Cir. 1993) ...................................................................................................3, 23

*In re Flash Memory Antitrust Litigation*,
No. C 07-0086 SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010) ........................................16

*Gates v. Rohm & Haas*,
655 F.3d 255 (3d Cir. 2011).................................................................................................36

*General Telelephone Co. of Southwest v. Falcon*,
457 U.S. 147 (1982).............................................................................................................22

*Gonyo v. Drake University*,
837 F. Supp. 989 (S.D. Iowa 1993) .........................................................................................3

*Hayes v. Wal-Mart Stores, Inc.*,
725 F.3d 349 (3d. Cir. 2013)...............................................................................19, 23, 26, 27

*Hildebrand v. Dentsply International, Inc.*,
264 F.R.D. 192 (E.D. Pa. 2010)......................................................................................15, 16

*Holmes v. Pension Plan of Bethlehem Steel Corp.*,
213 F.3d 124 (3d Cir. 2000)..............................................................................................11, 13

*In re Hydrogen Peroxide Antitrust Litigation*,
552 F.3d 305 (3d Cir. 2008)..............................................................................................18, 19

*Jackson v. Southeastern Pennsylvania Transportation Authority*,
260 F.R.D. 168 (E.D. Pa. 2009)...........................................................................................29

*Lusardi v. Xerox Corp.*,
975 F.2d 964 (3d Cir. 1992)...............................................................................................13, 17

*Marcus v. BMW of North America, LLC*,
687 F.3d 583 (3d Cir. 2012)...................................................................................... *passim*

*McNair v. Synapse Group Inc.*,
672 F.3d 213 (3d Cir. 2012)..............................................................................................11, 12

*Mielo v. Steak 'n Shake Operations, Inc.*,
897 F.3d 467 (3d Cir. 2018)................................................................................26, 27, 28, 30

*Neale v. Volvo Cars of North America, LLC*,
794 F.3d 353 (3d Cir. 2015)...............................................................................................11

*O'Neill v. Gourmet Systems of Minnesota, Inc.*,
219 F.R.D. 445 (W.D. Wis. 2002) ......................................................................................22

*In re Orthopedic Bone Screw Products Liability Litigation*,
176 F.R.D. 158 (E.D. Pa. 1997)..........................................................................................36

*Phillips v. Ford Motor Co.*,
    435 F.3d 785 (7th Cir. 2005) ..............................................................17

*Pryor v. National Collegiate Athletic Association*,
    288 F.3d 548 (3d Cir. 2002)............................................................2, 19

*Rodriguez v. National City Bank*,
    726 F.3d 372 (3d Cir. 2013)...............................................................29

*Rosetti v. Shalala*,
    12 F.3d 1216 (3d Cir. 1993)...............................................................17

*Rutstein v. Avis Rent–A–Car Sytems, Inc.*,
    211 F.3d 1228 (11th Cir. 2000) ..........................................................21

*Southeastern Pennsylvania Transportation Authority v. Gilead Sciences, Inc.*,
    102 F. Supp. 3d 688 (E.D. Pa. 2015) ....................................................2

*Shelton v. Bledsoe*,
    775 F.3d 554 (3d Cir. 2015)...............................................................24

*Stanford v. Foamex L.P.*,
    263 F.R.D. 156 (E.D. Pa. 2009) .........................................................35

*T.R. v. School District of Philadelphia*,
    No. 15-4782, 2019 WL 1745737 (E.D. Pa. April 18, 2019)......................27, 28, 31

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................ *passim*

*In re Wellbutrin XL Antitrust Litigation*,
    282 F.R.D. 126 (E.D. Pa. 2011)..........................................................17

*Williams v. School District of Bethlehem, Pa.*,
    998 F.2d 168 (3d Cir. 1993)................................................................3

*Wright v. American Bankers Life Assurance Company of Florida*,
    586 F. Supp. 2d 464 (D.S.C. 2008).......................................................17

**Statutes and Rules**

20 U.S.C. § 1681(a) ...................................................................................2

42 U.S.C. § 2000d.....................................................................................2

Federal Rule of Civil Procedure 23 ....................................................... *passim*

**Other Authorities**

1 McLaughlin on Class Actions § 4:36 (16th ed.) ..........................................................................16

2 Newberg on Class Actions § 4:34 (5th ed. 2019 update) .........................................................36

Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev.
    97, 131–132 (2009) ..................................................................................................................29

I.      **INTRODUCTION**

Plaintiffs seek to certify a class alleging that Defendant School District of Philadelphia (the "District") systematically discriminates against African-American female student athletes in violation of Title VI and Title IX in its interscholastic athletic program. After more than eight months of class discovery, it is clear that Plaintiffs cannot meet their burden to come forward with evidence showing their entitlement to class certification under Federal Rule of Civil Procedure 23 and the rigorous analysis this Court is required to undertake. For a myriad of reasons, Plaintiffs' Motion should be denied.

*First*, Plaintiffs' class representatives lack standing to seek injunctive relief, the only relief sought by the proposed class, and their injunctive relief claims are moot. Thus, because Plaintiffs cannot meet Article III's jurisdictional requirements, their Motion must be denied. Furthermore, despite knowing of these defects for *17 months*, including during the entire duration of class discovery, Plaintiffs only now seek a belated substitution. That late substitution would flout the Court's bifurcation order, unduly prejudice the District, and should be denied.

*Second*, Plaintiffs' proposed class cannot be certified because Plaintiffs have provided no evidence whatsoever that the District engaged in intentional race discrimination, and have thus failed to meet their burden to certify a Title VI class.

*Third*, Plaintiffs' proposed class definition is unclear and imprecise, and Plaintiffs provide no standards – let alone workable ones – for determining who is a student athlete, which students sought to play athletics, and which students were denied athletic opportunities by the District. Indeed, Plaintiffs' proposed class includes African-American female student athletes who attend schools like Strawberry Mansion – as the class representatives did – and who attend schools that Plaintiffs describe as more advantaged and well-supported, which results in a

proposed class that is overly broad and will require the Court to make numerous individual determinations about which students qualify as class members.

*Fourth*, Plaintiffs have not met their burden of producing evidence to meet Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements. For instance, Plaintiffs fail the typicality and adequacy requirements because they seek money damages and lack standing to seek injunctive relief, but the proposed class seeks only injunctive relief, not money damages. Plaintiffs also had numerous opportunities to play and did play sports, whereas the class Plaintiffs seek to represent were allegedly denied those opportunities.

*Fifth*, Plaintiffs have not met their burden under either Rule 23(b)(1) or 23(b)(2) because the proposed class lacks cohesiveness and no single injunctive or declaratory relief would be appropriate as to the proposed class as a whole.

## II.    BACKGROUND

### A.    The Requirements of Title VI and Title IX.

Plaintiffs seek certification of the proposed class under both Title IV and Title IX. Title VI bars discrimination "on the ground of race, color, or national origin" in "any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. A Title VI claim requires a plaintiff to show that she "(1) was a member of a protected class, (2) qualified for the benefit...at issue, (3) suffered an adverse action, and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *See Se Pa. Transp. Auth. v. Gilead Scis, Inc.*, 102 F. Supp. 3d 688, 701 (E.D. Pa. 2015). Title VI only provides a private right of action for intentional discrimination. *See, e.g.*, *Pryor v. NAACP*, 288 F.3d 548, 562 (3d Cir. 2002).

Title IX bars discrimination "on the basis of sex...under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). A Title IX claims requires a plaintiff to show "(1) that she was excluded from participation in or denied the benefits of or

subjected to discrimination in an educational program; (2) that the program receives federal

financial assistance; and (3) that the exclusion was on the basis of sex, i.e. gender." *Bougher v.*

*Univ. of Pittsburgh*, 713 F. Supp. 139, 143-44 (W.D. Pa.), *aff'd*, 882 F.2d 74 (3d Cir. 1989).

      "[I]t is clear that the obligation of an educational institution in complying with the

requirements of title IX in interscholastic athletics cannot be measured simply by comparing the

number of teams available to each sex, but instead must turn on whether disparities of a

substantial and unjustified nature exist in the benefits, treatment, services, or opportunities

afforded male and female athletes in the institution's program as a whole." *Williams v. Sch. Dist.*

*of Bethlehem, Pa.*, 998 F.2d 168, 176 (3d Cir. 1993) (internal quotation marks and citations

omitted). "Title IX and its regulations do not require institutions to expend equal amounts of

money on members of each sex." *Favia v. Indiana Univ. of Pa.*, 7 F.3d 332, 343 (3d Cir. 1993)

(internal quotations and citations omitted). Nor does Title IX require exact proportionality

between the gender distribution of a school and the number of athletic opportunities. *See Equity*

*In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 110 (4th Cir. 2011) (Title IX requires

"substantial proportionality," which is determined on a case-by-case basis, depending on the

specific circumstances and size of the athletic program). There is no "magic number at which

substantial proportionality is achieved." *Id.* Moreover, "Title IX does not establish a right to

participate in any particular sport…and there is no constitutional right to participate in

intercollegiate or high school athletics." *See, e.g.*, *Gonyo v. Drake Univ.*, 837 F. Supp. 989, 994

(S.D. Iowa 1993) (citations omitted).

    **B.**    **Procedural History**

      Against this backdrop, on September 12, 2017, Plaintiff Nadirah McRae, a former

African-American student athlete at Strawberry Mansion High School ("Strawberry Mansion")

filed a two-count class complaint against the District, alleging the District unlawfully

discriminates against African- American female student athletes in violation of Titles VI and IX. Plaintiffs filed an Amended Complaint (ECF 10) on December 11, 2017, adding a new Plaintiff, D.J., an African-American female student athlete who was then a student at Strawberry Mansion. On December 22, 2017, the District moved to dismiss the Amended Complaint (ECF 13).

On September 6, 2018, the Court issued a Memorandum (ECF 17) and Order (ECF 18) granting the District's motion to dismiss Ms. McRae's injunctive relief claim, holding that she lacked standing to pursue injunctive relief because she had already graduated from Strawberry Mansion and her injunctive relief claim was moot. (ECF 17, at 6, 10.). The Court held that D.J. had standing to pursue injunctive relief and her injunctive relief claim was not moot because, on the face of the Complaint, she remained a Strawberry Mansion student. (*Id.* at 6-7, 10-11.)

On March 4, 2019, Plaintiffs filed their operative Second Amended Complaint (ECF 30), describing the class as "all past, present and future African-American female student athletes, who participate, seek to participate, or have been deterred or prevented from participating in athletic programs, including but not limited to Field Hockey and Lacrosse, because of the District's discriminatory actions." (ECF 30 ¶ 22.) Plaintiffs clarified that they sought to certify a class under Rules 23(b)(1) and 23(b)(2) and that they sought monetary damages (on behalf of themselves, not the class) in excess of $250,000. (*Id.* ¶¶ 30-37 and Prayer for Relief.)

Plaintiffs made numerous allegations regarding District athletics, including that:

- The District "reserved" sports like field hockey and lacrosse for its "magnet and more privileged high schools," including Philadelphia High School for Girls ("Girls High"), Central High School ("Central"), George Washington High School, Northeast High School ("Northeast"), Abraham Lincoln High School, Frankford High School, and Parkway West High School (*Id.* ¶¶ 52-53);

- Northeast, "which has had a well-funded and supported girls field hockey team, for the 2015-2016 school year is 30.3% African American, 18.5% White, 21.2% Asian, 23.2% Latino, and 6.8% other races" (*Id.* ¶ 54);

- "[T]he District has actively worked to block girls, including Plaintiffs, from having the same opportunities as the girls at Northeast" (*Id.* ¶ 57);

- "[T]he District decided there was no place for girls of color in the Public League and in the traditionally 'white' sports of Field Hockey and Lacrosse" and, therefore, decided to group Strawberry Mansion "into what became known and referred to by District Coaches as the 'Negro League'" (*Id.* ¶¶ 64-65); and

- The decision "to relegate these girls to the 'Negro League' was not on the basis of the girls' athletic talent but the basis of their skin color and the District's prejudicial attitude towards girls of color playing traditional white-girl sports" (*Id.* ¶ 67).

On May 6, 2019, the Court entered an Order (ECF 34) bifurcating discovery into Phase I Discovery (Class Certification) and Phase II Discovery (Merits). On November 18, 2019, the Court entered an Order (ECF 37) extending the Phase I Discovery deadline to January 13, 2020.

### C.   Factual Background

#### 1.   The Plaintiffs

Plaintiff Nadirah McRae was a student athlete at Strawberry Mansion who graduated in June 2017. Ex. 1, Deposition of Nadirah McRae ("McRae Dep.") (Jan. 7, 2020), at 10:9-12. While at Strawberry Mansion, Ms. McRae played interscholastic athletics during every semester of her high school career, and in some semesters played more than one sport:

- During her freshman and sophomore years, she played volleyball, basketball, and track. *Id.* at 46:20-47:4, 50:3-6.

- During her junior year, she played volleyball, field hockey, basketball, track, and lacrosse. *Id.* at 50:9-16.

- During her senior year, she played volleyball, basketball, track, and lacrosse. *Id.* 51:19-21.

Plaintiffs allege that Ms. McRae was offered an athletic scholarship to play lacrosse at the University of Hartford, but that she lost that scholarship due to a District guidance counselor's failure to submit the necessary paperwork to Hartford. (ECF 30 ¶¶ 76-88.)

Plaintiff D.J. was also a student athlete at Strawberry Mansion who graduated in June 2018. Ex. 2, Declaration of James Patrick Lynch ("Lynch Decl.") ¶ 22. She played volleyball and lacrosse during her junior year and volleyball and basketball during her senior year.[1] *Id.* Plaintiffs allege D.J. experienced difficulties with Strawberry Mansion's administration and counseling personnel and "had to repeatedly request proof her SAT scores from the school only to be ignored." (ECF 30 ¶ 90.) The District lacks numerous facts about D.J., however, because despite repeated requests she never certified her responses to the District's Interrogatories, and the District was blocked from deposing her. Then, on the eve of the close of class discovery, Plaintiffs informed the District that D.J. no longer wanted to pursue this lawsuit.

### 2.    The District

The District is one of the largest, most diverse urban public schools district in the country. In 2018-2019, the District enrolled 126,994 students in District-operated schools, of whom 34,752 attended District high schools. Ex. 3, 2018-19 District Enrollment. The District's student population was 51.52% male and 48.48% female; 48.49% African-American, 21.71% Hispanic; 14.30% White; 8.92% Asian; and 6.31% Multiracial. *Id.* The District's high school population was 50.24 % male and 49.76% female; 51.82% African-American; 19.84% Hispanic; 12.65% White; 10.80% Asian; and 4.68% Multiracial. *Id.* The District currently operates 215 schools, of which 55 are high schools. *See* https://www.philasd.org/fast-facts/; https://www.philasd.org/cte/wp-content/uploads/sites/155/2019/09/HS-Directory-2020-WEB-2019-09-09.pdf.

---

[1] Plaintiffs seek to substitute D.J.'s younger sister, also D.J., as a plaintiff in this action. The younger D.J. is a junior at Strawberry Mansion and a year-round student athlete who has played volleyball, basketball, and track. Ex. 2 (Lynch Decl.) ¶ 23.

The District is committed to providing equal opportunity and to not discriminating in any way. The District's policies bar unlawful discrimination. *See, e.g.*, Ex. 4, Nondiscrimination in School and Classroom Practices; Ex. 5, Harassment and Discrimination of Students. That commitment extends to interscholastic athletics. Specifically, District policy provides that the District shall "offer opportunities for participation in interscholastic athletic programs to male and female students on as equal a basis as is practicable and without discrimination, in accordance with law and regulations." Ex. 6, Interscholastic Activities.

### 3. The District's Interscholastic Athletics Program

The District offers a robust interscholastic athletics program at the high school level. The District seeks to ensure equity in its athletic programs in numerous ways. First, as mentioned above, District policy requires the provision of equitable participation opportunities for male and female students and bars sex discrimination in the District. *Id.*; Ex. 5; Ex. 7, Deposition of James P. Lynch ("Lynch Dep.") (Dec. 11, 2019), at 57:12-16. Second, the District has a history of adding new girls' athletic programs and teams and supporting efforts to expand athletic participation, especially with regard to sports that are underrepresented and nontraditional in urban communities. Ex. 7 (Lynch Dep.), at 121:3-14, 123:3-24, 124:15-125:3 (noting the District tries to "increase our interest in girls lacrosse and field hockey, boy lacrosse, swimming, tennis… sports that are not very common in urban communities").[2] The District invests in new programs by ensuring there is a coach, assigning games, and providing equipment and uniforms if needed. *Id.* at 128:22-129:7. The District does not reserve any particular sports for any

---

[2] These efforts may include holding interest meetings, bringing in sports clinics, and supporting efforts of a teacher who played a sport in college and is interested in coaching it. Ex. 7 (Lynch Dep.), at 126:1-15.

particular school at all, and thus does not do so on the basis of race or gender. Ex. 2 (Lynch Decl.) ¶ 14.

Third, the District requires equity in the funding of its athletic programs. Specifically, the District pays boys and girls coaches at the same rate for a given sport, pursuant to a formula established through the collective bargaining process with its teachers. Ex. 7 (Lynch Dep.), at 52:13-53:8, 134:21-138:14; Ex. 8, Lynch Dep. Ex. 5. The District also pays for an athletic director at each school, not just some schools. Ex. 7 (Lynch Dep.), at 30:14-17, 182:11-15. It pays officials for all games, provides transportation for both boys' and girls' teams, and funds eight athletic trainers that serve *all* District athletic programs. *Id.* at 159:14-23, 165:20-166:19. The District also provides games balls to all District teams and works with athletic directors, sport chairs, and coaches to provide uniforms and equipment on an equitable basis to all District teams. Ex. 2 (Lynch Decl.) ¶ 15. It treats boys and girls teams the same with regard to benefits like attendance at out-of-state tournaments, meaning that it provides equal opportunities for boys and girls to participate in out-of-state tournaments if they qualify to participate and otherwise follow the District's gender- and race-neutral policies and procedures for approval of out-of-state trips. Ex. 7 (Lynch Dep.), at 53:17-23. It also works with all of its schools to ensure that all teams have appropriate facilities to practice and play, and it requires that that all of its best fields, termed "supersites," are lined and used for both boys' and girls' teams on an equitable basis. *Id.* at 93:13-94:9, 198:24-199:24.

Fourth, while the District has *minimum* participant numbers for athletic teams for safety and other reasons, it does not cap or limit the number of student athletes who may play on a

team, which increases athletic opportunities for all students. *Id.* at 99:18-100:1, 101:13-102:6.[3]

High school athletics is not like college athletics, where there are only a certain number of roster

spots. Here, there are minimum numbers but not limits or caps. Ex. 2 (Lynch Decl.) ¶ 16. The

District will support any team or sport, assuming it has the minimum number of participants.

Fifth, the District has co-op teams, subject to Pennsylvania Interscholastic Athletic

Association (PIAA) rules, that allow two or more schools, whose individual enrollment may be

insufficient to support separate teams, to combine to form a team in a given sport. Ex. 7 (Lynch

Dep.), at 139:21-141:21. These cooperative teams increase athletic opportunity, especially for

schools with smaller enrollments. The District also works to provide opportunities for student

athletes who desire to play a particular sport that is not offered at their school to play that sport at

a different high school, subject to PIAA rules. Ex. 2 (Lynch Decl.) ¶ 17.

Given the size of the District, there are different data sources for the number of District

high school athletic teams. First, there is a Title IX Report Summary, prepared by the District,

which notes that the District during the 2018-2019 year offered 15 girls' sports[4] with 398 teams

and 14 boys' sports with 329 teams. Ex. 9, Title IX Report Summary.

Second, the number of teams and an estimated number of participants can be calculated

from the District's 2019-2020 data on ArbiterLive, a site the District uses to schedule games and

---

[3] Plaintiffs repeatedly refer to the minimum participant number as the number of "roster spots"
for a sport. (*See, e.g.*, Pls. Mot., at 13 and Ex. C.) But the minimum participant number is a
minimum; there is no cap on the number of roster spots. Thus, the cap does not reflect the actual
number of roster spots on a given team or the actual number of participants in a given sport.
Accordingly, it is not synonymous with the number of athletic opportunities available.

[4] The District offers the following 15 girls' sports: soccer, volleyball, basketball, softball, tennis,
cross country, golf, field hockey, bowling, badminton, swimming, indoor track, track & field,
lacrosse, and cheerleading.

pay officials. Ex. 2 (Lynch Decl.) ¶ 18. These data include the District's varsity, junior varsity, and 9th grade teams. According to ArbiterLive, for 2019-2020 the District has 369 girls' teams, 348 boys' teams, and 55 coed teams. Ex. 10, 2019-20 ArbiterLive Data. Using the District's minimum participant numbers for each team, the District would have *at minimum* 11,750 student athletes, with 5,698 on boys' teams (48.54%), 5,112 on girls' teams (43.45%), and 940 on co-ed teams (8.01%).[5]

Third, the number of teams and estimated number of participants can be calculated from District data publicly reported to the PIAA. Ex. 2 (Lynch Decl.) ¶ 19. The PIAA data include only the District's varsity teams. The data show that the District currently offers 292 varsity girls' teams and 279 varsity boys' teams. Ex. 11, 2019-20 PIAA Data. Using the District's minimum participation numbers for each varsity team (and not including junior varsity teams), the District would have a minimum of 7,492 varsity student athletes, with 3,914 on boys' teams (52.24%) and 3,578 on girls' teams (47.76%). *Id.*

Fourth, data on single-sex interscholastic athletic teams and participants is reported by the District to the U.S. Department of Education's Office of Civil Rights (OCR), which publishes the data. These data exclude co-ed teams. The data show:

- For 2009, the District offered 295 female teams and 260 male teams, its enrollment was 51.1% male and 48.9% female, and the number of participants was 51.1% male and 48.9% female. Ex. 12, 2009 CRDC Data.

---

[5] Inexplicably, Plaintiffs calculate these numbers based on only on a selected subset of 21 District high schools, not on a District-wide basis. (Pls. Mem. at 12 n.4.) Plaintiffs contend there were at minimum only 4,384 student athletes in the District, of which 1,484 (33.85%) were female and 2,900 (66.15%) were male. Plaintiffs do not appear to include co-ed sports in their calculation. The District disputes these figures because they provide an incomplete and inaccurate view of the District's athletic program. For example, Plaintiffs' self-selected group of schools excludes Girls High, which offers 13 girls' varsity and 8 junior varsity teams.

- For 2011, the District offered 276 female teams and 246 male teams, its enrollment was 51.2% male and 48.8% female, and the number of participants was 51.1% male and 48.9% female. Ex. 13, 2011 CRDC Data.

- For 2015, the District offered 292 female teams and 285 male teams, its enrollment was 51.6% male and 48.4% female, and the number of participants was 53.5% male and 46.5% female. Ex. 14, 2015 CRDC Data.

## III.  ARGUMENT

### A.  For a Class to be Certified, At Least One Named Plaintiff Must Meet the Jurisdictional Requirements For Maintaining the Class; Here, Neither Do.

#### 1.  Plaintiffs Lack Standing to Seek Injunctive Relief.

It is black-letter law in a proposed class action that the Article III standing requirement must be satisfied by at least one named plaintiff. *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012). "Named plaintiffs are the individuals who seek to invoke the court's jurisdiction and they are held accountable for satisfying jurisdiction." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 364 (3d Cir. 2015). If no named plaintiff has Article III standing, the proposed class cannot be certified. *McNair*, 672 F.3d at 223 (holding where "prospective relief is sought, the plaintiff must show that [s]he is likely to suffer future injury from the defendant's conduct" and that "[i]n the class action context, that requirement must be satisfied by at least one named plaintiff" (internal quotation marks and citations omitted)); *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 135 (3d Cir. 2000) ("[A] plaintiff who lacks the personalized, redressable injury required for standing to assert claims on his own behalf would also lack standing to assert similar claims on behalf of a class.").

Here, the proposed class seeks only injunctive or declaratory relief, not money damages. Ex. 1 (McRae Dep.), at 39:23-41:18 (describing only injunctive relief being sought on behalf of the class); Pls. Mem at 36; ECF 30 ¶¶ 30-37 and Prayer for Relief (c)-(e). Not surprisingly then, Plaintiffs only pursue class certification under Rule 23(b)(1)(A) and 23(b)(2) – injunctive relief-

type classes. *See, e.g.*, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) ("Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class."); *Montgomery Cty., Pa. ex rel. Becker v. MERSCORP, Inc.*, 298 F.R.D. 202, 215 (E.D. Pa. 2014) ("[T]he Rule 23(b)(1)(A) requirement was designed to apply to cases in which it would be impossible for the defendant to comply with conflicting outcomes, specifically with regard to injunctive relief."). Even though Plaintiffs seek money damages for themselves, they do not pursue class certification under Rule 23(b)(3), as they do not seek money damages on behalf of the proposed class. *See Dukes*, 564 U.S. at 362 ("[W]e think it clear that individualized monetary claims belong in Rule 23(b)(3).")

Here, the Court has already determined that Ms. McRae lacks standing to pursue injunctive relief because she has graduated from Strawberry Mansion. (ECF 17, at 6.) As a result, Ms. McRae is not a proper class representative. *See McNair*, 672 F.3d at 223. Plaintiffs now concede that their other class representative, D.J., also lacks standing to pursue injunctive relief because she has also graduated from Strawberry Mansion. (Pls. Mem. at 4-5.) Therefore, she is also not a proper class representative (and has not been since June 2018, when she graduated). Because neither of Plaintiffs' class representatives have standing to pursue the injunctive relief sought by their proposed class, the Court must deny certification.[6]

## 2.   Plaintiffs' Claims for Injunctive Relief are Also Moot.

It is also black-letter law that at least one class representative must have a live claim that is not moot to pursue that claim on behalf of the proposed class. In *Brown v. Philadelphia*

---

[6] The discussion of Ms. McRae and D.J. in the remainder of the brief is to provide context, and should not be taken as an admission by the District that either Ms. McRae or D.J. has standing to pursue injunctive relief. They do not.

*Housing Authority*, 350 F.3d 338 (3d Cir. 2003), the Third Circuit described the "special mootness rules" that apply in the class action context:

> In the class action context, special mootness rules apply. 'Once a class has been certified, mooting of the class representative's claims does not moot the entire action because the class acquires a legal status separate from the interest asserted by its named plaintiff.' *Lusardi v. Xerox Corp.*, 975 F.2d 964, 974 (3d Cir. 1992) (internal quotations omitted). Litigation may continue because the stake of other class members is attributed to the class representative. *However 'when claims of the named plaintiffs become moot before class certification, dismissal of the action is required.' Id.* (internal citations omitted; emphasis added).

*Id.* at 343.

The Court has already determined that Ms. McRae's injunctive relief claim is moot because she graduated from Strawberry Mansion. (ECF 17, at 10 ("[T]he Court agrees that Plaintiff McRae's claim for injunctive relief is moot….").) Therefore, Ms. McRae is not a proper class representative for this reason, too. *See Brown*, 350 F.3d at 343. Plaintiffs now concede that D.J.'s injunctive relief claim is also moot because she, too, has graduated from Strawberry Mansion. (Pls. Mem. at 4-5.) Therefore, she is also not a proper class representative (and has not been since her June 2018 graduation). In addition, D.J.'s claim for injunctive relief is also moot because, as discussed more fully below, she has withdrawn from the case, has no interest in pursuing it, and did not participate in discovery even when she was a class representative, failing to certify her interrogatory responses or to appear for her deposition. Because the proposed class seeks only injunctive relief, and Plaintiffs' injunctive relief claims became moot before Plaintiffs moved for class certification, the Court must deny certification. *See Brown*, 350 F.3d at 343; *Holmes*, 213 F.3d at 135-36 ("If … the putative class representative's individual claim becomes

moot before he moves for class certification, then any subsequent motion must be denied and the entire action dismissed.").[7]

### 3.  Plaintiffs' Motion to Substitute Named Plaintiff Is Untimely and Would Unduly Prejudice the District.

Acknowledging that Plaintiffs are unable to seek injunctive relief on behalf of the proposed class – the only relief the proposed class seeks – and thus that Plaintiffs are not proper class representatives, Plaintiffs belatedly urge the Court to allow them to substitute D.J.'s younger sister to remedy this fundamental defect in their class certification motion. As discussed more fully below, Plaintiffs' motion should be denied.

By way of background, it was not until December 30, 2019, just nine business days before the deadline for class discovery (after it was extended once already), that Plaintiffs' counsel informed the District's counsel that D.J. "has decided to opt out of participating in the litigation" and sought the District's consent to the substitution of D.J.'s sister. In this email, Plaintiffs' counsel noted that D.J.'s sister was available after school hours on January 7, 2020 if the District wanted to depose her. Ex. 15, Dec. 30, 2019, 12:56 p.m. Email from G. Ellis to A. Schupack. On January 2, 2020, the District's counsel informed Plaintiffs' counsel that the District "cannot agree and will not stipulate" to the request to substitute "at this late stage of class discovery and will oppose any motion to amend." *Id.* at Jan. 2, 2020, 11:23 a.m. Email from A. Schupack to G. Ellis. Plaintiffs' counsel responded that Plaintiffs "will proceed with the substitution." *Id.* at Jan. 3, 2020, 11:21 a.m. Email from G. Ellis to A. Schupack. The District's counsel sought clarification, asking Plaintiffs' counsel what he meant and if he intended to file a

---

[7] In its opinion on the motion to dismiss, the Court suggested the acutely susceptible to mootness exception might apply to D.J. (ECF 17, at 10-11.) But the application of that exception is no longer an issue because Plaintiffs have conceded her claim is moot and because, in any event, D.J. has withdrawn from the case and has no interest in being a plaintiff.

motion to substitute. *Id.* at Jan. 3, 2020, 12:36 p.m. Email from A. Schupack to G. Ellis. Plaintiffs' counsel did not respond to the District's question, and never brought the issue up again. Nor did Plaintiffs seek, let alone obtain, leave from the Court to substitute a named plaintiff prior to filing their certification motion.

Plaintiffs' motion is untimely and there is no excuse for the delay. *See In re Brewer*, 863 F.3d 861, 876 (D.C. Cir. 2017) (affirming denial of motion to amend to add new class representatives where motion filed more than a year late). Indeed, at the time they filed their operative Second Amended Complaint, Plaintiffs knew D.J. had graduated from Strawberry Mansion in June 2018. They also knew, at least since the Court's September 6, 2018 decision on the District's motion to dismiss, that D.J. lacked standing to pursue an injunctive relief claim and that her claim was likely moot. Instead of moving promptly to remedy these defects by substituting an appropriate class representative, Plaintiffs waited for *17 months* to seek leave to substitute. *See Hildebrand v. Dentsply Int'l, Inc.*, 264 F.R.D. 192, 202 (E.D. Pa. 2010) ("To seek to substitute named Plaintiffs well after the close of discovery and extensive litigation, despite Plaintiffs' long-standing knowledge of the correct parties to be identified, is unacceptable.").

During those 17 months, (a) Plaintiffs filed their Second Amended Complaint (ECF 30) on March 4, 2019, in which they could have added a proper class representative (but did not); (b) the Court ordered discovery bifurcated on May 6, 2019 (ECF 34) to enable the parties to conduct discovery focused on class certification issues, including as to the named Plaintiffs; (c) the Court set deadlines for class discovery and the filing of the class certification motion; (d) the Court extended those deadlines at Plaintiffs' request; and (e) the District expended resources and money attempting to extract discovery from D.J. and responding to discovery requests from or related to D.J. This delay, waiting until the class certification motion to seek

substitution, is simply inexplicable. *See Hildebrand*, 264 F.R.D. at 202 ("Plaintiffs have flouted the Court's scheduling order for what appears to be tactical advantage and have provided no good cause for failing to seek further amendment to the Complaint in a timely manner."); *In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081, at *17 (N.D. Cal. June 9, 2010) (holding substitution motion filed contemporaneously with class certification motion was "untimely because Plaintiffs waited until after their class certification filing to request this substitution of plaintiffs"); 1 McLaughlin on Class Actions § 4:36 (16th ed.) ("Courts will not permit a plaintiff, before a certification motion has been made, to propose additional proposed representatives to hedge against potential shortcomings in the original plaintiff representative.").

Not only is the motion inexplicably untimely, but Plaintiffs' lack of diligence also unduly prejudices the District. The District has prepared its defense and taken class discovery of the named Plaintiffs and their claims in good faith, based on an understanding that the named Plaintiffs were the class representatives. The District produced D.J.'s student records as part of its first document production. *See* Ex. 16, Resp. & Obj. to Pls. First Set of Reqs. Prod., at No. 2. It attempted to obtain discovery from D.J. through Requests for Production, Interrogatories, and Requests for Admission. Exs. 17 to 19, Pls. Resps. to Def. Reqs. for Prod., Interrogs, and Reqs. for Admission. D.J. never provided a verification for her Interrogatory responses, however. *See* Ex. 15, at Dec. 6, 2019, 2:56 p.m. email from A. Schupack to G. Ellis; Dec. 16, 2019, 11:11 a.m. email from A. Schupack to G. Ellis; Dec. 30, 2019, 12:56 p.m. email from G. Ellis to A. Schupack. The District also requested deposition dates for D.J. beginning on October 2, 2019, but her deposition date was canceled. *See* Ex. 20, Oct. 2, 2019, 4:04 p.m. email from A. Schupack to G. Ellis (without attachments); Ex. 21, Oct. 25, 2019, 4:15 p.m. email from A. Schupack to G. Ellis (without attachments). The District asked repeatedly for dates for her

deposition, but was never given a date. Ex. 22, Oct. 28, 2019, 1:27 p.m. email from A. Schupack to G. Ellis; Ex. 15, at Dec. 6, 2019, 2:56 p.m. email from A. Schupack to G. Ellis. Then, on the eve of the close of discovery, the District was told that D.J. no longer wanted to pursue this litigation. *Id.* at Dec. 30, 2019, 12:56 p.m. email from G. Ellis to A. Schupack.

The District also has been denied the opportunity to engage in class discovery concerning D.J.'s sister. Plaintiffs' offer to make the new proposed plaintiff "available" for deposition just four business days before the close of discovery was an empty offer and could not cure the harm. The amount of time left before the close of discovery was insufficient for the District to depose D.J.'s sister, let alone after having obtained written and document discovery from her (which the District would otherwise have been entitled to do but could not due to the discovery deadline).

The cases on which Plaintiffs rely are distinguishable. (Pls. Mem. at 17-19.) In one, proposed substitution occurred *after* the class had been certified, which is not the case here. *See Wright v. Am. Bankers Life Assur. Co.*, 586 F. Supp. 2d 464, 467, 475 (D.S.C. 2008) (approving additional class representative whose substitution was sought nearly 4 years *after* class certified). In another, the named plaintiffs' claims became moot because benefits were granted while the class certification motion was pending, whereas here the mootness occurred long before the motion was filed. *See Rosetti v. Shalala*, 12 F.3d 1216, 1228 (3d Cir. 1993) (holding award of benefits "did not deprive the district court of jurisdiction over the named plaintiffs' *already pending motion for class certification*" (emphasis added)). *Phillips v. Ford Motor Co.*, 435 F.3d 785, 787 (7th Cir. 2005), does not help Plaintiffs either, as that court expressly recognized that, under the Third Circuit's decision in *Lusardi v. Xerox Corp.*, 975 F.2d 964, 977-78 (3d Cir. 1992), substitution should not be permitted where the attempt comes long after the named plaintiffs' claim became moot. *In re Wellbutrin XL Antitrust Litigation*, 282 F.R.D. 126, 139

(E.D. Pa. 2011) is distinguishable, too, as it deals with finding proper representatives for three of

six proposed class states, not with mootness of the named plaintiff's claims at all.

Accordingly, Plaintiffs' motion to substitute should be denied.[8]

**B.    Plaintiffs' Motion for Class Certification Does Not Otherwise Meet the Requirements Necessary for Class Certification.**

**1.    Plaintiffs Have the Burden of Establishing Their Entitlement to Class Certification, and the Court Must Undertake a Rigorous Analysis of Plaintiffs' Evidence.**

To obtain certification, a class must satisfy the requirements of Rule 23(a), which sets

forth four prerequisites to class certification, typically referred to as numerosity, commonality,

typicality, and adequacy. In addition, the proposed class must fall within one of the three

categories in Rule 23(b). *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 302 (3d Cir. 2005). Plaintiffs,

as the proponent of class certification, bear the burden of proving both the prerequisites of a class

action under Rule 23(a) and that the class fits within one of the Rule 23(b) categories. *See*

*Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012).

"In deciding whether to certify a class under [Rule] 23, the district court must make

whatever factual and legal inquiries are necessary and must consider all relevant evidence and

arguments presented by the parties." *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305,

307 (3d Cir. 2008) The Court's class certification analysis must be "rigorous." *Dukes*, 564 U.S.

at 350-51. "[T]he decision to certify a class calls for findings by the court, not merely a

---

[8] Should the Court be inclined to consider granting the motion, however, the District respectfully requests that the Court stay its decision on class certification and reopen class discovery to permit the District to take class discovery concerning D.J.'s sister's claims and her suitability to serve as a class representative. Given the dearth of record evidence concerning D.J.'s sister, Plaintiffs cannot satisfy their burden to certify a proposed class with D.J.'s sister as a class representative. Nor can the Court conduct a rigorous analysis of D.J.'s sister's ability to represent the proposed class based only on Plaintiffs' allegations. *See Dukes*, 564 U.S. at 350 ("Rule 23 does not set forth a mere pleading standard.").

'threshold showing' by a party, that each requirement of Rule 23 is met," and "[f]actual determinations supporting Rule 23 findings must be made by a preponderance of the evidence." *Hydrogen Peroxide*, 552 F.3d at 320. "In other words, to certify a class the district court must find the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23." *Id.* "A party's assurance to the court that it intends or plans to meet the requirements is insufficient." *Id.* at 318.

> **2.      Plaintiffs Have Provided No Evidence Whatsoever that the District Engaged in Intentional Discrimination, And Have Failed to Meet Their Burden to Certify a Title VI Class.**

As an initial matter, Plaintiffs provide no evidence that the District engaged in intentional race discrimination and thus have failed to meet their burden to come forward with evidence necessary to certify a Title VI class. *See Dukes*, 564 U.S. at 350 ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."). To certify a private Title VI class, Plaintiffs must provide evidence that the District engaged in systematic intentional discrimination or acted with deliberate indifference on the basis of race. *See Alexander v. Sandoval*, 532 U.S. 275, 281 (2001); *Pryor*, 288 F.3d at 562; *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 273 (3d Cir. 2014).

Plaintiffs have nowhere furnished any such evidence, let alone evidence that would enable the Court to certify a class under a rigorous analysis. *See Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 354 (3d. Cir. 2013) ("It is plaintiff's burden to show that a class action is a proper vehicle for this lawsuit."). Plaintiffs furnish no evidence to support the few allegations of intentional race discrimination in their motion and cannot point to a single act of intentional race discrimination or deliberate indifference committed by the District on a systemic basis. Instead,

Plaintiffs' only evidence of alleged racial discrimination is "evidence" purporting to demonstrate a "gender gap" at 13 of their 21 self-selected high schools that have African-American student populations greater than 62%. (Pls. Mem. at 16.)

Plaintiffs' calculation of this alleged "gender gap," using only the schools they deemed appropriate, is deeply flawed. Indeed, Plaintiffs' 13 (self-)selected high schools with an African-American population of at least 62% do not include Girls High, which has an African-American population of 66% and a robust girls' interscholastic athletic program. But even ignoring the flawed numbers, this is disparate impact evidence, not evidence of any intentional acts of race discrimination by the District, and it does not suffice for purposes of Title VI. *See Alexander*, 532 U.S. at 293. According to Plaintiffs, this disparate impact evidence shows the District "intentionally chooses to allocate less opportunities and financial support to schools with majority African-American populations." (Pls. Mem. at 20.) But dressing up disparate impact evidence by adding the word "intentionally" does not transform it into evidence of intentional conduct. Plaintiffs also allege that the District "restricts…African-American females to stereotypical sporting opportunities." (*Id.*) Plaintiffs do not explain what this means, and they present no evidence of any such restrictions placed on African-American female student athletes by the District. *See Blunt*, 767 F.3d at 294 (insufficient evidence administrators placing students "intended to discriminate against them because of their race").[9] The District turned over all of its

---

[9] Plaintiffs' Motion does not even mention – let alone provide any evidence regarding – the alleged "Negro League" discussed at length in their Second Amended Complaint (an appellation the District vehemently rejects).

policies and practices regarding how it runs its athletic programs, but Plaintiffs point to no policy or practice whatsoever that suggests let alone establishes any intentional race discrimination.[10]

Indeed, the uncontroverted evidence shows that the District – with a high school student population that is more than 50% African-American – does not discriminate on the basis of race in its athletic programs and affirmatively seeks to create opportunities for everyone, including African-American female students, to participate in athletics. By way of example, Ms. McRae played field hockey and lacrosse at Strawberry Mansion in new programs created by the District, and she testified she was encouraged to do so by District personnel. Ex. 1 (McRae Dep.), at 61:10-62:24, 70:12-71:11. Furthermore, Girls High, with an enrollment that is two-thirds African-American, offers both field hockey and lacrosse. This is consistent with the testimony of the District's Executive Director of Athletics that the District seeks to increase opportunities for all students to play sports, especially sports that are underrepresented in urban communities. Ex. 7 (Lynch Dep.), at 121:3-14, 123:3-24, 124:15-125:3. Moreover, Ms. McRae testified that she played sports during every season of her high school career (three seasons per year), and in some cases played two sports during a single season. Ex. 1 (McRae Dep.), at 46:20-47:4, 50:3-6, 50:9-16, 51:19-21. She also testified she never reported to the District any concerns about alleged race discrimination in athletics while she was a student. *Id.* at 38:21-39:13.

Plaintiffs' failure to furnish evidence to support certification of a Title VI class, coupled with the evidence showing the District has not engaged in systemic intentional race discrimination or acted with deliberate indifference, means Plaintiffs have entirely failed to meet their burden of establishing a certifiable Title VI class. *See Rutstein v. Avis Rent–A–Car Sys.,*

---

[10] Plaintiffs also provide no evidence that the District subjected D.J.'s sister to intentional race discrimination. Thus, if substitution were granted, the District's arguments that Plaintiffs have failed to meet their burden of certifying a Title VI class would apply with equal force.

*Inc.*, 211 F.3d 1228, 1235 (11th Cir. 2000) (denying class certification because disparate impact evidence cannot establish intentional discrimination against every member of the putative class); *O'Neill v. Gourmet Sys. of Minnesota, Inc.*, 219 F.R.D. 445, 454 (W.D. Wis. 2002) ("The Supreme Court has expressed skepticism that Rule 23(a)'s typicality requirement is satisfied when a representative plaintiff attempts to sustain an individual claim by proving intentional discrimination when class claims hinge on statistical evidence of disparate impact." (citing *General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 159 (1982)).[11]

### 3. Plaintiffs Rely on Significantly Flawed Data in an Attempt to Create the Misimpression That the District Violates Title IX.

The District operates 55 high schools, which are classified as Neighborhood, Citywide Admission, or Special Admission. *See* https://www.philasd.org/studentplacement/wp-content/uploads/sites/19/2019/09/HS-Directory-2020.pdf. Despite admitting in their Motion that Title IX requires an evaluation on a District-wide basis (Pls. Mem. at 20), Plaintiffs exclude Special Admission high schools from their analysis and calculations entirely (and, tellingly, do not provide a rationale for that exclusion). Although Special Admission high schools such as Girls High (an all-girls school) and Central have their own admissions criteria, they are District-operated schools that fully participate in the District's athletic programs under the same rules, policies and procedures as all other District high schools. Moreover, Plaintiffs do not even include all of the 33 Neighborhood and Citywide high schools in their 2012-2013 and 2019-2020 calculations, respectively, without explaining the reason for the omission of certain high schools.

---

[11] While the Court seemed to accept that Plaintiffs' allegations concerning the alleged "Negro League" sufficed at the motion to dismiss stage, Plaintiffs did not seek discovery on those allegations during class discovery, have not come forward with any evidence regarding the alleged "Negro League" or even mentioned that term in their class certification motion, and have not offered any other evidence to demonstrate intentional race discrimination.

In addition to using data from only a self-selected group of schools, Plaintiffs' allegations of gender discrimination are based largely on seven-year-old 2012-2013 data the District reported to the Pennsylvania Department of Education (PDE). But this data is significantly out-of-date, does not provide a current picture of the District's athletic programs, and predates the period when the Plaintiffs played sports at Strawberry Mansion. There are better sources for more recent data about the District's athletic programs, including the ArbiterLive, PIAA, and U.S. Department of Education data described above.[12] Plus, this data removes more than half of the District's high schools and necessarily a significant number of teams, which is simply inaccurate.[13]

---

[12] Plaintiffs make much the District's failure to report data to PDE in more recent years. (Pls. Mem. at 10-12.) But this is much ado about nothing. The District's Executive Director of Athletics explained that the structure of the District makes it impossible to provide all of the information PDE requests, PDE has therefore refused to accept the District's submissions, and PDE has declined to work with the District on altering its data collection to accept the District's data. Ex. 7 (Lynch Dep.), at 73:11-76:8. It is certainly not the District's position that "it would rather not know whether or not it is in compliance with Title IX" (Pls. Mem. at 12), and Plaintiffs' accusation has no evidentiary or other support. Moreover, comparing a District with 55 high schools to an individual charter school is like comparing a basket of 55 oranges to one apple. Furthermore, "the nature or thoroughness of a defendant's recordkeeping does not alter the plaintiff's burden to fulfill Rule 23's requirements." *Hayes*, 725 F.3d at 356.

[13] As discussed above, Title IX, of course, does not require equal expenditures on boys' and girls' sports, but rather the provision of equal opportunities. *See, e.g., Favia*, 7 F.3d at 343. Moreover, as noted, the District spends equally on coaches, athletic directors, trainers, and game officials, provides game balls and facilities to all teams on an equal basis, provides uniforms and equipment to teams that need them, and provides transportation to teams that require it, all without regard to race or gender. Ex. 7 (Lynch Dep.), at 30:14-17, 52:13-53:8, 53:17-23, 93:13-94:9, 134:21-138:14, 159:14-23, 165:20-166:19, 182-11-15, 198:24-199:24; Ex. 8; Ex. 2 (Lynch Decl.) ¶ 15. Plaintiffs also seek to hold the District accountable for "a significant nationwide gender gap," gender disparities in athletics throughout Pennsylvania, and the alleged gender gap in all urban schools. (Pls. Mem. at 9-10.) But the Court should disregard these statistics, as they are not specific to the District.

### 4.    Plaintiffs' Proposed Class Definition Is Unclear and Imprecise.

Plaintiffs' motion for class certification should also be denied because their proposed

class definition is unclear and imprecise. A properly defined class is one that "(1) meets the

requirements of Rule 23(a); (2) is sufficiently cohesive under Rule 23(b)(2) ...; and (3) is capable

of the type of description by a 'readily discernible, clear, and precise statement of the parameters

defining the class,' as required by Rule 23(c)(1)(B)." *Shelton v. Bledsoe*, 775 F.3d 554, 563 (3d

Cir. 2015); *Marcus*, 687 F.3d at 592-93 (requiring class parameters to be clear and precise).

Plaintiffs' class definition fails to meet the "readily discernible, clear, and precise" standard.

Plaintiffs define the class they are trying to certify as:

> all past, present and future African-American female student athletes, who
> participate, seek to participate, or have been deterred or prevented from
> participating in athletic programs, including but not limited to Field
> Hockey and Lacrosse, because of the Philadelphia School District's
> discriminatory actions in the (1) the allocation of athletic participation
> opportunities; (2) allocation of financial resources; and (3) allocation of
> benefits.

(Pls. Mem. at 4.)

The class is defined to include all African-American student "athletes." But what criteria

determines whether someone in the class is an "athlete"? Is it a student who wants to play sports

but by choice has never participated in District athletics? Is it a student who has participated in at

least one sport? Or two sports? The proposed definition does not say. Nor could the proposed

class encompass all African-American female students attending District high schools, because

some proportion of those students undoubtedly never sought to participate in interscholastic

athletics at all or were unable to do so for medical, academic, or other eligibility reasons. *See*

*Blunt v. Lower Merion Sch. Dist.*, 262 F.R.D. 481, 488 (E.D. Pa. 2009) (holding that a class of

"all African American students" who suffer educational discrimination was overly broad and

unsupported), *aff'd*, 767 F.3d 247 (3d Cir. 2014).

Moreover, the proposed class seeks to include "athletes" who participate in District athletic programs "*because of* the Philadelphia School District's discriminatory actions," which makes no sense. In addition, no criteria are provided for determining which of the "athletes" were allegedly deterred or prevented from participating in athletics. Nor does the proposed class definition explain how to determine if "athletes" were prevented or deterred from playing because of the "Philadelphia School District's [alleged] discriminatory actions" or for some other reason entirely.[14]

Critically, Plaintiffs' class definition also conflicts with the allegations in the Second Amended Complaint.[15] Specifically, the Second Amended Complaint alleges the District "funds, supports and encourages girls at schools like Northeast to play Lacrosse while refusing to make those opportunities available to girls of color at schools like Strawberry Mansion" and "has actively worked to block girls, including Plaintiffs, from having the same opportunities as the girls at Northeast." (ECF 30 ¶¶ 56-57.) Indeed, Plaintiffs describe Northeast as having a "well-funded and supported girls field hockey team" (*Id.* ¶ 54.) Yet, by definition, Plaintiffs' proposed class, which includes "all past, present, and future African-American student athletes" would include the same African-American female student athletes (and there are many) who attend the

---

[14] Notably, if Ms. McRae were still attending Strawberry Mansion, certainly she would *not* be a part of any such class because she played a sport during every season of her high school career. Nor would the proposed class include D.J., who played sports at Strawberry Mansion and presents no evidence that the District ever prevented her from doing so. Ex. 2 (Lynch Decl.) ¶ 22. If substitution were granted, D.J.'s sister would also not be a member of any such class because she also plays sports during each high school season. *Id.* ¶ 23.

[15] The District does not accept Plaintiffs' allegations as true. Plaintiffs have the burden of showing that they can certify a proposed class, however, and the fact that many of the allegations in their operative Second Amended Complaint conflict with their class certification motion is highly relevant to the Court's rigorous analysis.

"magnet schools and more privileged high schools" for which the District has allegedly reserved participation in field hockey and lacrosse. (ECF 30 ¶¶ 52-53.) Thus, Plaintiffs' proposed class would include student athletes who attend schools like Northeast, even though Plaintiffs provide no evidence of discrimination against these students, and in fact allege that these students are advantaged, not discriminated against, by the District.[16]

     **5.**     **Plaintiffs Have Not Met Their Burden of Producing Evidence that Could Meet the Certification Prerequisites in Rule 23(a).**

     **a.**     **Plaintiffs Have Not Met the Numerosity Requirement.**

Rule 23(a) requires Plaintiffs to furnish sufficient evidence to enable the Court to make a factual determination, without resorting to impermissible speculation, that the proposed class is so numerous that joinder of all members is impracticable. *See* Fed. R. Civ. P. 23(a)(1); *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 484 (3d Cir. 2018) (court must "make a factual determination, based on the preponderance of the evidence, that Rule 23[(a)]'s requirements have been met" and "[i]n recent years the numerosity requirement has been given 'real teeth.'"). A party seeking class certification must prove (a) a sufficiently large number of potential class plaintiffs and (b) impracticability of joinder. *Mielo*, 897 F.3d at 484. While "Rule 23(a)(1) does not require a plaintiff to offer direct evidence of the exact number and identities of the class members...in the absence of direct evidence, a plaintiff must show sufficient circumstantial evidence specific to the…problems, parties, and geographic areas actually covered by the class definition to allow a district court to make a factual finding." *Hayes*, 725 F.3d at 357.

A court may use common sense assumptions to determine whether numerosity has been satisfied. *Mielo*, 897 F.3d at 486. But such assumptions must still be based on evidence. *Marcus*,

---

[16] Nor does the data Plaintiffs rely on to create the impression that females are given less opportunities to participate in athletics than males include many of these District high schools, such as Girls High and Central.

687 F.3d at 596-97. Importantly, "where a putative class is some subset of a larger pool, the trial court may not infer numerosity from the number in the larger pool alone." *Hayes*, 725 F.3d at 358. Although it may be "tempting to assume" that a class satisfies numerosity because its members will be drawn as a subset from a larger pool, the Third Circuit "has rejected the idea that giving in to such temptation could excuse speculation." *Mielo*, 897 F.3d at 485.

Here, despite being required to come forth with evidence to enable the Court to make a factual determination, without resorting to impermissible speculation, that the proposed class meets the numerosity requirement, Plaintiffs provide none and instead invite the Court to engage in speculation. Indeed, Plaintiffs provide no District-wide data on the size of their proposed class. Specifically, they furnish no data, criteria, or methodology for determining the number of African-American female student athletes who are part of their proposed class, or the number of African-American female students who sought to participate in athletics or were deterred or prevented from doing so because of the District's alleged discrimination. In the absence of this information, the Court can only speculate about the size of the proposed class. *See Mielo*, 897 F.3d at 486 (holding court could not use "common sense" to determine class size where insufficient evidence precluded making such an assumption).

Moreover, Plaintiffs cannot simply rely on District data on African-American female enrollment, as that data would not be sufficient to meet the numerosity requirement without requiring the Court to resort to speculation. *See T.R. v. Sch. Dist. of Phila.*, No. 15-4782, 2019 WL 1745737, at *11 (E.D. Pa. April 18, 2019) (holding numerosity requirement not met where Plaintiffs' evidence proved existence of larger pool of individuals, but not the size of the proposed class plaintiffs sought to certify). That data would not show the number of African-American female student *athletes* in the District, let alone the number of African-American

female student athletes who contend their participation in interscholastic athletics was tainted by discrimination. Nor would that information indicate the number of African-American female students who sought to participate or were deterred or prevented from participating in athletics by the District's alleged discrimination. At bottom, Plaintiffs ask the Court to infer the number of class members is sufficiently large from the mere existence of a large pool of African-American female students who attend District schools. But this is a leap too far. *See Mielo*, 897 F.3d at 486.[17]

Plaintiffs also assert that joinder of all class members is impracticable. To the extent that it is, that difficulty is in part because of Plaintiffs' inability to furnish a clear and precise class definition to determine who the class members are. Furthermore, Plaintiffs assert joinder is impracticable because "Federal court litigation is expensive" without providing any evidentiary support for that statement, let alone evidence that litigation costs have prevented potential class members from initiating their own lawsuits. *See T.R.*, 2019 WL 1745737, at *12 (holding plaintiffs failed to meet numerosity requirement where they advanced unsupported argument it would be impracticable to join all class members because many were of limited English proficiency and had limited resources). Similarly, in an obviously desperate attempt to meet the numerosity requirement, Plaintiffs assert, with no evidentiary support, that the "prospect of retaliation" has prevented potential class members from coming forward to enforce their rights.

---

[17] Similarly, Plaintiffs assert that 2,478 new female students enroll annually in the District, and that these students are all members of the proposed class. But Plaintiffs do not explain how they calculate this annual new enrollment figure, how many of these students are African-American, and how many of these students participate or seek to participate in interscholastic athletics. Indeed, Plaintiffs admit that "it is completely unknown as to how many of those new female students will become female athletes in the District." (Pls. Mem. at 25.)

There are no allegations of "retaliation" in the Complaint whatsoever. The Court is not required

to nor should it accept such unsupported assertions. *See Jackson v. Se. Pa. Transp. Auth.*, 260

F.R.D. 168, 176 n.1 (E.D. Pa. 2009) (refusing to accept as true facts in class certification motion

that go "beyond the allegations of the Complaint without citation to evidence").[18]

### b.      Plaintiffs Have Not Met the Commonality Requirement.

Rule 23(a)(2) requires Plaintiffs to demonstrate that "there are questions of law or fact

common to the class." *See* Fed. R. Civ. P. 23(a)(2). "[T]he focus of the commonality inquiry is

not on the strength of each plaintiff's claim, but instead is on whether the defendant[s'] conduct

was common as to all of the class members." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382

(3d Cir. 2013). Nonetheless, the Rule 23(a)(2) "language is easy to misread, since '[a]ny

competently crafted class complaint literally raises common questions.'" *Dukes*, 564 U.S. at 349

(quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97,

131–132 (2009)). A complaint's mere recital of superficial questions that happen to be shared by

class members, such as whether each class member suffered a violation of the same provision of

law, is "not sufficient to obtain class certification." *Id.* Rather, Rule 23(a)(2) requires that the

resolution of the common question of law or fact must "resolve an issue that is central to the

validity of each one of the claims in one stroke." *Id.* at 350.

Plaintiffs have not and cannot meet their burden of showing commonality. First, litigating

Plaintiffs' claims will require evaluating individualized questions of fact and law that are not

common to all proposed class members. For example, Ms. McRae contends the District

discriminated against her when a counselor failed to submit paperwork to allow her to claim a

collegiate athletic scholarship. But there are no allegations, let alone evidence, that the District

---

[18] Because the numerosity requirement does not turn on facts specific to the class representatives, the District's arguments would apply equally to D.J.'s sister if substitution were granted.

discriminated against any other members of the proposed class in this manner. D.J. contends the District discriminated against her by failing to provide her with proof of her SAT scores. But there are no allegations, let alone evidence, that the District has discriminated in a systemic manner against other proposed class members by failing to provide them with their SAT scores. Nor are these alleged acts of discrimination, which center on alleged administrative paperwork errors, related in any way to the equity of the District's interscholastic athletic program.

But even focusing on interscholastic athletics, Plaintiffs do not allege that the District's conduct was common as to all proposed class members. Again, Plaintiffs' proposed class apparently consists of all African-American female student athletes in the District. A significant number of these proposed class members, however, attend schools that Plaintiffs allege are advantaged and have well-funded and supported girls teams, including Girls High and Northeast. Plaintiffs do not explain how African-American female student athletes at what they describe as advantaged schools are being discriminated against, or provide any evidence that they are being discriminated against. Plaintiffs also appear to distinguish in their motion between the treatment of African-American female student athletes at schools that are at least 62% African-American and other District schools. This suggests that Plaintiffs do not believe the District's conduct is common as to all members of the proposed class, but rather depends on the particular school a proposed class member attends.

Thus, any attempt to resolve the issues in this case would quickly run into dealing with school-specific differences. *See Mielo*, 897 F.3d at 489 (holding that although all class members might allege an ADA violation – even of the same provision of the ADA – "this only establishes that putative class member 'merely' allege to 'have all suffered a violation of the same provision of the law" because the law could be violated in many different ways). For example, if the

District decided to invest resources in a new sports program at Girls High, which is 66% African-American, that may create more athletic opportunities for African-American female student athletes. Yet that investment of resources would flow to what Plaintiffs view as an advantaged school and would not help African-American female student athletes at Strawberry Mansion, who would not get those resources. In that situation, one part of the proposed class would view the District's action as nondiscriminatory, while another portion would see it as discriminatory.

As another example, African-American female student athletes at smaller enrollment high schools like Strawberry Mansion have a better chance, on a percentage basis, of playing athletics than do African-American female athletes at larger enrollment schools like Northeast. If the District tried to remedy this discrepancy by creating additional teams at Northeast (another allegedly advantaged school), those resources would be creating more opportunities for African-American female student athletes, just not at Strawberry Mansion. Again, some in the proposed class would arguably view the District's action as furthering discrimination, while others would see the same conduct as countering discrimination. The commonality requirement aims to prevent these cross-cutting scenarios. *See, e.g.*, *T.R.*, 2019 WL 1745737, at *15 (holding commonality requirement not satisfied where District's provision of translation services might, in some cases, deny a parent the right of meaningful participation in the child's IEP, while in other cases that same conduct would allow meaningful participation).

Moreover, many students who attend the allegedly "disadvantaged" schools like Strawberry Mansion have numerous opportunities to play interscholastic athletics. Ms. McRae, for example, played a sport each semester during high school, and during some semesters she played two simultaneously. D.J. also played sports at Strawberry Mansion and does not allege

that the District prevented her from doing so. Student athletes like Ms. McRae and D.J. were thus not denied athletic participation opportunities by the District, and the Court would have to spend significant time making individualized determinations about which students had sufficient athletic opportunities based on non-existent criteria, as Plaintiffs have not proposed any standards for making that determination.[19]

Nor have Plaintiffs provided any criteria for determining which particular students seek to participate in interscholastic athletics. Thus, even if the District were ordered to create more athletic opportunities, it is impossible to know whether particular students would participate in those opportunities. Indeed, it is just as possible that creating more athletic opportunities will end up diluting existing athletic opportunities among more or less the same number of student athletes, rather than creating more student athletes.

### c.   Plaintiffs Have Not Met the Typicality or Adequacy Requirements.

Plaintiffs' proposed class also cannot be certified because Plaintiffs have not met their burden of showing that their class representatives' claims are typical of those of the proposed class or that they are adequate class representatives. Typicality "screen[s] out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." *Marcus*, 687 F.3d at 598. To determine whether a named plaintiff is markedly different from the class as a whole, the court must address three distinct concerns: "(1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a

---

[19] D.J.'s sister has also played sports at Strawberry Mansion and, were the Court to grant substitution, the District's commonality arguments would apply to D.J.'s sister as a class representative as well.

defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class." *Id.* at 598.

"The principal purpose of the adequacy requirement is to determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class." *In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.,* 795 F.3d 380, 393 (3d Cir. 2015). The adequacy requirement has two components: (1) the interests and incentives of the representative plaintiffs; and (2) the experience and performance of class counsel. *Dewey v. Volkswagen Aktiengesellschaft,* 681 F.3d 170, 181 (3d Cir. 2012).

First, the class representatives' claims are markedly different in both legal theory and factual circumstances than the claims of the proposed class. Both Ms. McRae and D.J. contend that District counselors intentionally discriminated against them through paperwork errors that have nothing to do with equity in interscholastic athletics. There are no allegations relating to the proposed class of systemic paperwork errors by District counselors targeting African-American female student athletes; all the class allegations and Plaintiffs' Motion for Class Certification focus on alleged inequity and discrimination in the District's interscholastic athletic program.

Plaintiffs' circumstances are also not typical of the proposed class of African-American female students who were deprived of an opportunity to play interscholastic athletics because they both played interscholastic athletics. Ms. McRae played interscholastic athletics every semester during high schools – in some cases more than one sport per season – and alleges she was offered a collegiate athletic scholarship. Ex. 1 (McRae Dep.), at 46:20-47:4, 50:3-6, 50:9-16, 51:19-21; ECF 30 ¶¶ 76-88. Nor can Plaintiffs represent African-American female student athletes who attended allegedly advantaged schools like Girls High. Plaintiffs allege African-

American student athletes who attended these schools received benefits that were denied to African-American female students like Plaintiffs at schools like Strawberry Mansion.[20]

Second, the class representatives' claims will be subject to defenses not generally applicable to the proposed class. *See Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006) (questions regarding defenses uniquely available to defendants against named plaintiff bear on both typicality and adequacy of class representative). Plaintiffs seek money damages; the proposed class does not. In defense to Plaintiffs' money damages claim, the District may raise governmental immunity, argue Plaintiffs never incurred any money damages, or that those damages were the product of negligence by a third party, such as the NCAA, University of Hartford, or the College Board. The District will also litigate the merits of Plaintiffs' particular claims regarding the paperwork errors, including attempting to show *inter alia* that no such errors were made, any such errors were the fault of third parties, and/or any such errors were the product of negligence (if any) and not intentional race or gender discrimination. These defenses would play a significant role at trial, and Plaintiffs would need to "devote time and effort to the defense[s] at the expense of issues that are common and controlling for the class." *See id.* at 297.

Third, Plaintiffs' interests are not aligned with those of the proposed class. Plaintiffs seek money damages; the class does not. Plaintiffs accordingly have a strong incentive to litigate those aspects of the case that may result in a monetary recovery – the alleged paperwork errors and Ms. McRae's alleged loss of her athletic scholarship – whereas the proposed class is focused solely on injunctive relief. Thus, Plaintiffs' claims are not typical of the proposed class, and there is a fundamental conflict between the class representatives and proposed class. Indeed, based

---

[20] D.J.'s sister plays sports at Strawberry Mansion, so she also would be neither a typical nor adequate class representative for these reasons.

Plaintiffs' allegations, Plaintiffs' focus is on the interests of African-American female student athletes who attend schools like Strawberry Mansion, not on the interests of African-American female student athletes who attend allegedly advantaged schools like Girls High.

      **6.**    **Plaintiffs Have Not Met Their Burden Under Federal Rules of Civil Procedure 23(b)(1) or 23(b)(2).**

In addition to the Rule 23(a)'s requirements, Plaintiffs must furnish evidence showing their proposed class fits into one of Rule 23(b)'s three kinds of class actions. They have not.[21]

      **a.**    **Plaintiffs Have Not Met Their Burden to Show That the Proposed Class Satisfies Rule 23(b)(1)(A).**

A Rule 23(b)(1)(A) class is proper where prosecuting separate actions by individual class members would result in the defendant being subjected to incompatible standards of conduct. *See* Fed. R. Civ. P. 23(b)(1)(A). Certification pursuant to Rule 23(b)(1) creates a mandatory class with no opt-out. *Stanford v. Foamex L.P.*, 263 F.R.D. 156, 172 (E.D. Pa. 2009). Here, certification of this proposed class would run a greater risk of subjecting the District to incompatible standards than would the risk of individual adjudications. As set forth above, the class representatives seek to advance the interests of African-American female students who attend schools like Strawberry Mansion, but their proposed class includes African-American female student athletes who attend what they allege are advantaged schools. As a result, the District may be subjected to incompatible standards if this proposed class is certified and relief is granted on a class-wide basis. Furthermore, Plaintiffs assert that certification under Rule 23(b)(1) would "allow for an examination and determination as to the District's athletic program as a

---

[21] If substitution were granted, these arguments would apply to any proposed class D.J.'s sister seeks to represent because she attends Strawberry Mansion like D.J. and Ms. McRae did, so the proposed class would lack cohesiveness whether D.J. or her sister served as class representative.

whole," but they furnish no District-wide data regarding the District's athletic program that would enable the Court to reach such a conclusion.[22]

### b. Plaintiffs Have Not Met Their Burden of Showing That Their Class Satisfies Rule 23(b)(2).

A Rule 23(b)(2) class action is proper where the party opposing the class has acted or refused to act on grounds generally applicable to the class, so that final injunctive or declaratory relief is appropriate respecting the class as a whole. *See* Fed. R. Civ. P. 23(b)(2). A Rule 23(b)(2) class must be sufficiently cohesive. *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998) ("While 23(b)(2) class actions have no predominance or superiority requirements, it is well established that the class claims must be cohesive."). For a court to find a class cohesive, it must find that the "class's claims are common ones and that adjudication of the case will not devolve into consideration of myriad individual issues." 2 Newberg on Class Actions § 4:34 (5th ed. 2019 update). "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Dukes*, 564 U.S. at 360. The Third Circuit has held that any "'disparate factual circumstances of class members' may prevent a class from being cohesive." *Gates v. Rohm & Haas*, 655 F.3d 255, 264 (3d Cir. 2011). The key to the 23(b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360.

---

[22] Plaintiffs fail to make any showing or advance any argument that they are entitled to certification under Rule 23(b)(1)(B), which addresses possible prejudice to putative class members and is typically used in "limited fund" cases. *See In re Orthopedic Bone Screw Prod. Liab. Litig.*, 176 F.R.D. 158, 176 (E.D. Pa. 1997). Accordingly, Plaintiffs' class should not be certified under this provision.

Plaintiffs' class is not sufficiently cohesive. Plaintiffs have alleged significant differences between District high schools, all of which are attended by members of the proposed class. Any adjudication of the claims of the proposed class would, therefore, devolve into consideration of myriad individual issues concerning the characteristics and athletic offerings of particular schools attended by particular class members. Given these differences, it is difficult to envision how a single injunction or declaratory judgment would provide relief to all members of the proposed class. If the Court ordered the District to create additional athletic teams at Strawberry Mansion, for instance, that would provide no relief to proposed class members attending schools like Northeast or Girls High. Similarly, if the Court required the District to create additional athletic opportunities for African-American female students generally, and the District created those opportunities at schools such as Girls High but not Strawberry Mansion, no relief would be provided to African-American female student athletes at Strawberry Mansion.

## IV.    CONCLUSION

Plaintiffs have not met their burden of coming forward with evidence to establish that their proposed class meets the requirements of Rule 23 under the rigorous analysis that the Court is required to conduct. Nor have Plaintiffs met their burden of establishing that they are entitled to substitute class representatives at this late date. Accordingly, the District respectfully requests that the Court deny Plaintiffs' motion for class certification and deny Plaintiffs' motion to substitute.

**HANGLEY ARONCHICK SEGAL**
**PUDLIN & SCHILLER**

Dated:  March 11, 2020

 */s/ Bonnie M. Hoffman*
Bonnie M. Hoffman (PA I.D. 201140)
Adam N. Schupack (PA I.D. 320910)
One Logan Square, 27th Floor
Philadelphia, PA  19103-6933
215.568.6200
215.568.0300/facsimile

*Attorneys for Defendant The School District of*
*Philadelphia*